## O'BRIEN *v.* WHEELOCK.

CERTIORARI TO THE UNITED STATES CIRCUIT COURT OF APPEALS FOR
THE SEVENTH CIRCUIT.

No. 38.  Argued October 21, 22, 1901.—Decided February 24, 1902.

An unconstitutional law cannot be held valid as to particular parties on
the ground of estoppel, and executed as a law.

In accordance with a certain act of the General Assembly of Illinois, bonds
had been issued by commissioners appointed for the purpose of con-
structing a levee, and assessments had been made to pay for them against
lands alleged to have been benefited; some of the land owners contested
judgment on the assessments, and the act was adjudged by the Supreme
Court of the State to be unconstitutional; the bonds and the assessments
fell with the act, and the land owners were not estopped from denying
its validity.

A party who has received the full benefit of proceedings under a law found
to be unconstitutional may, on occasion, be compelled to respond on the
theory of implied contract.

But in this case the land owners had not received and could not receive the
benefits contemplated.  The scheme embraced not only the construction
but the maintenance of the levee, and its maintenance by compulsory
process failed with the law ; the consideration was indivisible and in-
capable of apportionment, and the evidence showed that by the break-
ing of the levee the land owners had sustained losses in excess of the
amount of the bonds.

If any ground of relief as on implied contract had ever existed, the want
of diligence presented an insuperable bar to its assertion.

Bond holders had filed a bill against the commissioners to compel the col-
lection of assessments, to which the land owners were not parties, which
went to a decree July 7, 1880, finding certain amounts due to complain-
ants, without prejudice, and giving them leave to file " a bill or bills,
original, supplemental, or otherwise" against the land owners for the
recovery of the amounts due, but no bill was filed until April 22, 1889.
The act under which the proceedings were taken was held to be uncon-

stitutional at January term 1876 of the state Supreme Court. *Held :* That the present bill was an original bill as to the land owners, and not having been filed until thirteen years after the act was declared to be unconstitutional and nearly nine years after the leave granted, there had been such laches as precluded granting the relief sought, the conditions of the property and the relations of the parties having in the meantime greatly changed as detailed in the opinion.

THIS case is brought here by certiorari to the Circuit Court of Appeals for the Seventh Circuit to review a decree of the Circuit Court of the United States for the Southern District of Illinois, 78 Fed. Rep. 673, affirmed by the Court of Appeals, 95 Fed. Rep. 883. The bill relates to certain proceedings under an act of the General Assembly of the State of Illinois, approved April 24, 1871, entitled " An act to provide for the construction and protection of drains, ditches, levees and other works." The opinion of the Circuit Court of Appeals was delivered by Mr. Justice Harlan, presiding as Circuit Justice, and the case is therein stated thus :

" By the above act of the General Assembly of Illinois, it was provided that whenever one or more owners or occupants of lands desired to construct ' a drain or drains, ditch or ditches, across the lands of others, for agricultural and sanitary purposes, such person or persons may file a petition in the county court of the county in which the drain or drains, ditch or ditches, shall be proposed to be constructed, setting forth the necessity of the same, with a description of its or their proposed starting point, route and terminus, and if it shall be deemed necessary for the drainage of the land of such petitioners that a levee or other work be constructed, the petitioners shall so state, and set forth a general description of the same as proposed, and may pray for the appointment of commissioners for the construction of such work, pursuant to the provisions of this chapter.' § 1.

" The act required notice by publication to be given of any petition filed under its provisions, and that : ' Such notice shall state when and in what court the petition is filed, the starting point, route and terminus of the proposed drain or drains, ditch or ditches, or levees, and if a levee or other work is intended

to be constructed in connection therewith, shall so state, and at what term of court the petitioners will ask a hearing upon such petition.' § 2.

"If the drain or drains, ditch or ditches, levee or other work proposed to be constructed, was to pass through or over, or be constructed upon, lands lying in different counties, the petition could be filed in the county court of either county. § 4.

"The court in which the petition was filed was empowered to determine all matters pertaining to the subject-matter of the petition.

"If it appeared that the proposed drain or drains, ditch or ditches, levee or other work, was necessary or would be useful for the drainage of the lands for agricultural and sanitary purposes, the court was required to so find, and appoint three competent persons as commissioners to lay out and construct such proposed work. § 5.

"It was made the duty of the commissioners to examine the lands proposed to be drained, and those over or upon which the work was proposed to be constructed, and determine : ' (1) Whether the starting point, route and terminus of the proposed drain or drains, ditch or ditches, and if a levee or other work is proposed, the proposed location thereof, is or are in all respects proper or most feasible, and if not, what is or are so ; (2) The probable cost of the proposed work, including all incidental expenses, and the expenses of the proceeding therefor ; (3) What lands will be injured thereby, and the probable aggregate amount of all damages such lands will sustain by reason of the laying out and construction of the proposed work ; (4) What lands will be benefited by the construction of the proposed work, and whether the aggregate amounts of benefits will equal or exceed the costs of constructing such work, including all incidental expenses and costs of the proceeding.' § 9.

"If the commissioners found and reported that the expense would more than equal the benefits, the proceedings were to be dismissed ; if less, then they were to have plans, profiles, surveys, and specifications made, and report the same to the court. §§ 10, 11.

" The commissioners were not confined to the point of com-
mencement, route, or terminus of the drains or ditches, or to
the number, extent, or size of the same, or the location, plan, or
extent of any levee or other work, as indicated in the petition.
But they were directed to locate, design, lay out, and plan the
same as they thought would drain the petitioner's land with
the least drainage, and for the greatest benefit of all the lands
to be affected thereby. All plans proposed by the commission-
ers could be changed by the court on the application by them
or by any person interested. § 12.

" The act required due notice by publication to be given of
any application to confirm the report, and the privilege was
given to all persons interested to appear and contest its confir-
mation, or to ask any modification thereof. If no objections
were made to the report, or if the objections made to it were
not well taken, it was to be confirmed. If the court was of
opinion that the report should be modified, it was given au-
thority to make such modification as would be equitable. §§ 13,
14.

" If the report was confirmed, then the court was authorized
to impanel a jury of twelve men competent to serve as jurors,
who, being duly sworn, were required to assess damages and
benefits according to law ; or the court could direct that a jury
be impaneled before a justice of the peace for the assessment of
damages and benefits, in which case the commissioners could
apply to any justice of the peace in the county, who should im-
mediately, without the formality of any written application,
proceed to summon and impanel a jury of six men competent
to serve as jurors, who should be sworn in the same manner as
was provided in case of a jury impaneled by the court in which
the proceeding is pending, the justice to enter upon his docket
a minute of such proceeding before him, and the names of the
jurors. § 16.

" The duty of the jury was to examine the land to be af-
fected by the proposed work ; ascertain to the best of their
ability and judgment the damages and benefits sustained by or
accruing to the land affected by the construction of the pro-
posed work ; make out an assessment roll, in which should be

set down in proper columns the names of owners, when known, a description of the premises affected, in words or figures, or both, as was most convenient, the number of acres in each tract, and, if damages were allowed, the amount of the same; and in case damages were allowed to, and benefits assessed against the same tract of land, the balance, if any, should be carried forward to a separate column for damages or benefits, as the case might be. § 17.

"In making the assessment the jury were required to award and assess damages and benefits in favor of and against each tract of land separately, in the proportion in which such tract of land would be damaged or benefited; and in no case should any tract of land be assessed for benefits in a greater amount than its proportionate share of the estimated cost of the work and expenses of the proceeding, nor in a greater amount than it would be benefited by the proposed work, according to the best judgment of the jury. § 18.

"The commissioners, or any person who made objection to the assessment, were given the right of appeal from the finding of the jury. If, upon such appeal, there were corrections of the assessment, or if the assessment roll was confirmed, then the roll was to be spread upon the record, with right of appeal or writ of error therefrom. §§ 24, 26.

"At the time of confirming the assessment the court could order the assessment of benefits to be paid in instalments of such amounts and at such times as would be convenient for the accomplishment of the proposed work; otherwise, the whole amount should be payable immediately upon the confirmation, and should be 'a lien upon the lands assessed until paid.' § 27.

"It was made the duty of the clerk, immediately after the entry of the order of confirmation, to make out and certify to the commissioners a copy of the assessment roll, and also to make out and deliver to the commissioners separate copies of the same, pertaining to the lands situated in different counties, to be recorded in the recorder's office of the respective counties in which the lands were situated, and which should be notice of the lien thereon to all persons. § 28.

"Upon receiving a certified copy of such assessment, the com-

missioners could proceed to collect the same, or any instalment thereof, or certify the assessment of any instalment thereof which they might be entitled to collect at the time to the county clerk of the county in which the lands assessed were situated, who was required to 'extend the same, in a separate column, upon the proper tax books for the collection of state and county taxes: Provided, the owner, agent or occupant of any land through or on which any drain, ditch or levee shall be constructed shall have the right, under the direction of said commissioners, within such time as they shall prescribe, to construct such drain, ditch, or levee, or any part thereof, at his own cost; and in case he shall so construct the same, he shall be allowed for the value thereof upon his assessment.' § 29.

"In case the assessment for benefits should be payable in instalments, such instalments were to draw interest at the rate of ten per centum per annum from the time they became payable till they were paid, and the interest could be collected and enforced as part of the assessment. § 30.

"Other sections of the act are as follows:

"'§ 31. When the commissioners shall have elected to collect any assessment or instalment thereof themselves, or shall not have caused the same to be extended upon the state and county tax books, and any assessment or instalment shall be due and uncollected, and as often as any instalment shall become due and be uncollected at the time for making return of the tax books for the collection of state and county taxes next succeeding the time of the receipt of the certified copy of the assessment by the commissioners, or the falling due of any instalment, the commissioners may return a certified list of such delinquent lands, with the amount due thereon, to the officer who shall be authorized by law to receive the return of the books for the collection of state and county taxes in the counties or respective counties where the lands are situated, who shall proceed to collect and enforce the same in the same manner as other taxes or special assessments are enforced, and shall pay over the amounts so collected to the commissioners.'

"'§ 34. The commissioners, when appointed and qualified pursuant to this chapter, may do any and all acts that may be

necessary in and about the surveying, laying out, constructing, repairing, altering, enlarging, cleaning, protecting and maintaining any drain, ditch, levee or other work for which they shall have been appointed, including all necessary bridges, crossings, embankments, protections, dams and side drains, and may employ all necessary agents and servants, and enter into all necessary contracts, and sue and be sued.

" ' § 35. The commissioners may borrow money, not exceeding in amount the amount of assessment unpaid at the time of borrowing, for the construction of any work which they shall be authorized to construct, and may secure the same by notes or bonds, bearing interest at a rate not exceeding ten per centum per annum, and not running beyond one year after the last assessment on account of which the money is borrowed shall fall due, which notes or bonds shall not be held to make the commissioners personally liable for the money borrowed, but shall constitute a lien upon the assessment for the repayment of the principal and interest thereof.'

" ' § 37. All damages over and above the benefits to any tract of land shall be payable out of all the amounts assessed against other lands for benefits, and shall be paid or tendered to the owner thereof before the commissioners shall be authorized to enter upon his land for the construction of any work thereon. In case the owner is unknown, or there shall be a contest in regard to the ownership of the land, or the commissioners cannot, for any reason, safely pay the same to the owner, they may deposit the same with the clerk of the court, and the court may order the payment thereof to such party as shall appear to be entitled to the same.'

" ' § 45. Any person who shall wrongfully and purposely fill up, cut, injure, destroy or in any manner impair the usefulness of any drain, ditch or other work constructed under this chapter, or that may have been heretofore constructed, for the purposes of drainage or protection against overflow, may be fined in any sum not exceeding two hundred dollars, to be recovered before a justice of the peace in the proper county ; or if the injury be to a levee, whereby lands shall be overflowed, he may, on conviction in any court of competent jurisdiction, be fined in any

sum not exceeding five thousand dollars, or imprisoned in the county jail not exceeding one year, or both, in the discretion of the court. All complaints under this section shall be in the name of the people of the State of Illinois, and all fines when collected shall be paid over to the proper commissioners, to be used for the work so injured.

"'§ 46. In addition to the penalties provided in the preceding section, the person so wrongfully and purposely filling up, cutting, injuring, destroying or impairing the usefulness of any such drain, ditch, levee or other work, shall be liable to the commissioners having charge thereof for all damages occasioned to such work, and to the owners and occupants of lands for all damages that may result to them by such wrongful act, which may be recovered before a justice of the peace, if within his jurisdiction, or before any court of competent jurisdiction.' Laws of Ill. 1871-2, pp. 356-365.

"Proceeding under the above act, numerous owners and occupants of the lands known at the time as the 'Mississippi bottom lands,' in the counties of Adams, Pike, and Calhoun, Illinois, filed a petition in the county court of Pike County, expressing their desire to construct drains and ditches, and also a levee and other works, across the lands of others in that bottom, for agricultural and sanitary purposes, so as to reclaim the bottom land from overflow by the waters of that river, 'in order to make the location salubrious, and render the soil available for tillage and otherwise develop the agricultural resources of said bottom land.' They represented that 'said bottom land has been from time immemorial, and now is, a low and nearly level tract of land formed by deposits of alluvion from said river; that it is traversed throughout nearly its entire length by a slough or bayou known as 'the Sny Cartee slough;' that said bottom land is also variously intersected by other and smaller sloughs, some of which are short channels putting out from the river and returning thereto, while others start from and return to the said Sny Cartee slough, and others are, again, lateral branches connecting said Sny Cartee slough with the river; that the said bottom land is below the level of the high water mark of said river, and absolutely without protection there-

from; that the greater part thereof is nearly every year inundated by the waters of said river, and all are subject to inundation, and have been repeatedly submerged by said overflow, the river on such occasions being a stream from about four to eight miles wide, and running from bluff to bluff on either side;' 'that, by reason of said exposure to overflow, the mass of the said bottom land has been allowed to remain in its primitive condition, and will so remain unless reclaimed; that it is but sparsely populated, and that the occupants thereof support themselves almost exclusively by the cultivation of the soil; that they are every year greatly embarrassed in putting in their crops by the peculiar character of the rise in said river, which has no regular time for reaching its maximum height, nor any fixed number of rises during a season; that their crops when planted are frequently destroyed by an unexpected rise in said river, and in such cases they are either compelled to replant their crops, or the crops are destroyed so late in the year as to render the operations of the season a total failure;' 'that upon the subsiding of the waters the said bottom land is left in a wet and marshy condition, so that the stagnant water is left on various parts of its surface, and the succeeding heat of summer and autumn evolve therefrom malaria and disease;' 'that by reason of said facts said bottom land not only now remains sparsely populated, while the territory around it is thickly settled, but the same is practically incapable of supporting any further population, so that the average taxable value of the lands now subject to overflow is no more than about fifty cents per acre, and the present occupants of said bottom lands have been in most cases induced to remain solely by the prospect of the ultimate reclamation of said land, a consummation which has been the theme of their enterprise and endeavor ever since the settlement of the bottom land described.'

"The petitioners called the attention of the court to the act of 1871, and asked the appointment of commissioners, in accordance with the provisions of that law, 'for the purpose of constructing a levee on the Mississippi River, from a point on said river at or near the head of the Sny Cartee, in the county of Adams and State of Illinois, and thence in a southerly direc-

tion along or near the east bank of the Mississippi River, as shall be deemed advisable for the safety of the proposed work, to a point at or near the mouth of Hamburg Bay, in the county of Calhoun, State of Illinois, and to do and perform any and all acts, as provided in said law, for the surveying, laying out, and constructing, altering, repairing, enlarging, protecting, and maintaining, said proposed levee, or to render it efficient for the protection and reclamation of the lands lying east of the said levee, and between it and the bluffs, and now subject to overflow by the Mississippi River and other streams.'

"After asking a confirmation of the report of the commissioners, if they found and reported that the proposed levee could be constructed at a cost not exceeding $5 per acre for all lands benefited and reclaimed from overflow, the petitioners prayed : 'That the assessment for benefits upon the property to be affected by the construction of said work shall be paid in ten equal annual instalments, the first instalment being due and payable three years after the date of the commissioners' report and the filings of the plans and specifications with the court, and one-tenth of such assessment, with accrued and accruing interest, each year thereafter, until the whole amount shall have been paid.'

"The county court of Pike County having found that the proposed work was necessary, appointed in 1871, William Dustin, George W. Jones and John G. Wheelock commissioners, and they duly qualified and acted in that capacity. In the same year the commissioners reported the result of their examination, and in their report indicated, by map and profiles, the work to be done. The report was confirmed without objection, and a jury of twelve was organized to assess damages and benefits, and make an assessment roll. The assessments were made and put upon the record of the court. Certified copies of the assessments were recorded in Pike, Adams, and Calhoun Counties. An order was made requiring the assessments to be paid in ten annual instalments, with interest from October, 1872.

"In conformity with the order of the court, the commissioners issued bonds from time to time, upon estimates made by the engineer as the work progressed, to be used in the construction

and completion of the work. They were delivered directly to the contractors as they were earned. The first issue of bonds amounted to $499,500, of which Francis Palms purchased $202,500. A second issue was made, amounting to $148,500, which were also purchased by him. That issue was the result of a second petition under the act of 1871, proceedings under which resulted in further assessments.

"It may be here stated that by an act of the general assembly of Illinois, approved April 9, 1872, it was provided that whenever it appeared by the findings of the court before which proceedings were pending or might be had, under the act of April 24, 1871, that any drain, ditch, levee, or other work authorized by that act to be made would be of public benefit for the promotion of the public health, or in reclaiming or draining lands, the same should be deemed 'a public work;' and that it should be lawful for the commissioners appointed under the act of 1871 to register at the office of the auditor of public accounts any bonds issued by them under order of court; such registration to show the date, amount, number, maturity, and rate of interest of the bonds, and the fact of such registration to be certified by the auditor, under his seal of office, upon each bond. The act contained other provisions, but it is not necessary to refer to them.

"All of the bonds issued by the commissioners were in the same form. We give here a copy of one of them, issued in 1872:

"'No. 6.          United States of America.          $500.
"'Sny Island Levee Bond.
"'State of    (Ten per cent interest bond.)    Illinois.

"'The commissioners appointed by the county court of Pike County and State of Illinois, on the petition of John Morris and others, to locate and construct a levee on the Mississippi River, in the counties of Adams, Pike, and Calhoun, by virtue of an act of the general assembly of the State of Illinois entitled "An act to provide for the construction and protection of drains, ditches, levees and other works," and by power vested in them by said act, acknowledge themselves, as such commis-

sioners, held and firmly bound unto John G. Wheelock or bearer in the sum of five hundred dollars, lawful money of the United States, payable in the city of New York, at the bank or agency used by the treasurer of the State of Illinois, on the first day of October, A. D. 1882, with interest at the rate of ten per cent per annum, interest payable on the first day of July in each year, on the surrender of annexed coupons as severally due.

"' This bond is one of a series of five hundred thousand dollars issued for the purpose aforesaid, and after an order of the county court of Pike County aforesaid approving of the assessment made by a jury of the cost of said levee.

"' In witness whereof, the said commissioners,' etc.

" Annual interest coupons, payable to bearer, were attached to each bond.

" On each bond was endorsed a certificate in these words :

"' Auditor's Office, Illinois.

"' Springfield, Nov. 12th, 1872.

"' I, Charles E. Lippincott, auditor of public accounts of the State of Illinois, do hereby certify that the within bond has been registered in this office this day pursuant to the provisions of an act entitled " An act to provide for the registration of drainage and levee bonds, and secure the payment of the same," approved April 9th, 1872, and in force July 1st, 1872.

"' In testimony whereof,' etc.

" At the January term, 1876, of the Supreme Court of Illinois, the case of *Updike* v. *Wright*, 81 Ill. 49, was decided. That case involved, among other questions, the constitutionality of the above act of April 24, 1871, providing for the construction and protection of drains, ditches, levees, and other works. The case related to certain proceedings taken for the construction of a levee on the banks of the Wabash River. The representation to the county court was that the lands of the petitioners were subject to overflow from that river, that their fences and crops were liable to be swept away and destroyed by such overflow, and that the same could be prevented by an earth work levee.

"After observing that the above act of 1871 was evidently passed in view of article 4, section 31, of the Illinois constitution of 1870, declaring that 'the general assembly may pass laws permitting the owners or occupants of lands to construct drains and ditches for agricultural and sanitary purposes across the lands of others,' Chief Justice Scott, delivering the unanimous judgment of the court, said: 'Apparently, an effort was made to have the law enacted conform to the constitutional provisions in every particular. Hence it is declared the work to be done is the construction of drains and ditches for agricultural and sanitary purposes, and if it becomes necessary, in the construction of a system of drainage, that a "levee or other work" be adopted to make that system available, such levee or other work may be constructed under the provisions of the statute. But it is nowhere intimated the owners or occupants of land may undertake, under the provisions of this law, the building and maintenance of an immense levee on the borders of a river, not connected with any system of drainage by ditches. Neither the constitution nor the statute contemplates any such work. What was in the minds of the framers of the constitution, and the legislators who enacted the law in pursuance of its provisions, must have been the drainage of lands by means of drains and ditches, and what is said in the statute on the subject of a "levee or other work" is always in connection with a system of drainage in that mode. The work outlined by the constitution and the statute is comparatively insignificant, and may be done at no great cost; but that which is undertaken in this case is the construction of a levee on the banks of the Wabash River, of many miles in length, and estimated to cost a great many thousands of dollars. No system of drainage by drains and ditches was planned, nor deemed necessary for agricultural and sanitary purposes. The representation to the county court is, the lands of the petitioners are subject to overflow from the Wabash River; that their fences and crops are liable to be swept away and destroyed by such overflow; and that the same can be prevented by an earthwork levee. The undertaking is one of great magnitude, and will require the expenditure of large sums of money. The assess-

ment on complainant's land is over $10,000. And the allega-
tion in the bill is that, unless all further assessments proposed
to be made be arrested, the levee will cost more than the land
is worth. Any construction of the statute that would warrant
the owners or occupants of lands to enter upon such an im-
mense and costly work seems forced and unreasonable. It is
only in connection with drainage for agricultural and sanitary
purposes that "levees or other works" may be undertaken, as
auxiliary to the drainage of the lands. Our opinion is, this is
the only construction the statute will bear, consistently with
the constitution; otherwise, one owner, whose lands are sub-
ject to overflow at certain seasons of the year from a river,
could set in motion the proceedings for the erection of a levee
sufficient to protect his lands, no matter how expensive, and
have the cost levied upon the lands of others in the vicinity
which commissioners appointed by the court might deem bene-
fited by the improvement. Such a work cannot be said to be
draining lands by drains and ditches over the lands of others;
nor is such a levee, in any just sense, in the language of the
statute, "necessary to the drainage of the lands." The work
of constructing a great levee along the banks of a river subject
to overflow, which defendants are about to do, is not embraced
within the provisions of the statute, and is therefore without
authority of enabling law.'

"But the court proceeded to observe that the decision could
be placed on the ground that the general assembly possessed
no power under the constitution to vest commissioners or juries
selected, or the county court, with authority to assess and
collect taxes or special assessments for the contemplated im-
provement. It said: ' Section 5, article 9, of the constitution
of 1848, which declared " the corporate authorities of counties,
townships, school districts, cities, towns and villages may be
vested with the power to assess and collect taxes for corporate
purposes, such taxes to be uniform in respect to persons and
property within the jurisdiction of the body imposing the
same," was always construed by the decisions of this court as
a limitation upon the power of the general assembly to grant
the right to assess and collect taxes to any other than the cor-

porate or local authorities of the municipalities or districts to be taxed. *Board of Directors* v. *Houston*, 71 Ill. 318; *Harward* v. *The St. Clair and Monroe Levee and Drainage Co.*, 51 Ill. 130; *South Park Commissioners* v. *Salomon*, 51 Ill. 37; *Gage* v. *Graham*, 57 Ill. 144; *Hessler* v. *Drainage Commissioners*, 53 Ill. 105. It was also held that power in the legislature was subject to the further limitation that a local burden of taxation or special assessments could not be imposed upon a locality without the consent of the taxpayers to be affected. That section of the constitution of 1870, upon this subject, provides: "The general assembly may vest the corporate authorities of cities, towns and villages with power to make local improvements by special assessments, or by special taxation of contiguous property, or otherwise. For all other corporate purposes, all municipal corporations may be vested with authority to assess and collect taxes, but such taxes shall be uniform in respect to persons and property within the jurisdiction of the body imposing the same." The clause in the present constitution, like that in the constitution of 1848, must be construed as a limitation on the power of the legislature. Giving it that construction, the general assembly can only vest cities, towns, and villages with power to make local improvements by special assessments or special taxation upon contiguous property benefited by such improvement. By necessary implication, it is inhibited from conferring that power upon other municipal corporations or upon private corporations. Only cities, towns, and villages are within the constitutional provisions; and, although other municipal corporations may be vested with power to assess and collect taxes for corporate purposes, the limitation is absolute, such taxes shall be uniform in respect to persons and property within the jurisdiction imposing the same. With equal propriety, this clause of the present constitution must be regarded as restricting the general assembly in conferring the power to levy and collect taxes, either general or special, to the mode and manner therein indicated. We do not understand the legislature possesses plenary power, unlimited and unrestricted, to invest whomsoever it may choose with authority to assess and collect either special assessments

or taxes for every conceivable purpose. As we have seen, only cities, towns, and villages may levy special assessments or special taxation for local improvements, and all other municipalities can only be vested with jurisdiction to assess and collect taxes for corporate purposes; and that, too, under the positive inhibition such taxes shall be uniform in respect to persons and property. It would seem, therefore, to follow, as a corollary from the propositions stated, that neither the commissioners or the juries selected, nor the county court, is such a body as, under the constitution, may be given power to make local improvements by special assessments or by special taxation upon contiguous property. There is still another consideration that has an important bearing upon the decision of the case. The clause of the constitution we have been considering, like that in the constitution of 1848, must be understood, in the light of the decisions of this court, as forbidding the general assembly from imposing a burden by taxation upon any locality, without the consent of the citizens affected. Under this law, the people whose property is subject to taxation or assessments have never given any consent to it, if we exclude those who may have signed the petition addressed to the county court. No opportunity was afforded them to do so, nor does the law make any provision for submitting the question to a vote, to ascertain the will of those whose property is subjected to this local burden. It is imposed upon them under the statute, by the decision of the county court. Obviously, that section of the constitution that declares "the general assembly may pass laws permitting the owners or occupants of lands to construct drains or ditches, for agricultural and sanitary purposes," implies that the community whose property is to be taxed may have the right of election in the matter. Otherwise, an onerous burden may be imposed upon them, without their consent, and such proceedings might be had as would result in the deprivation of property. How can the land owners be permitted to construct drains and ditches, unless some election is guaranteed to them? The language employed implies voluntary action. Illustration will make the inconsistency of the present law apparent. For example, the privilege is given to any occupant,

as well as the owner of land, of presenting a petition to the
county court. Should the construction contended for prevail,
a tenant residing upon land adjacent to a river subject to over-
flow might present a petition, and, under the decision of the
court, the work of erecting a levee miles in length, and costing
large sums of money, might be entered upon, and the expenses
assessed upon the property in proximity to the river that might
in any degree be deemed benefited. An intention to confer
such unwarranted power upon one man, who would himself be
subject to none of the burdens imposed, ought not to be im-
puted to the legislature. Any laws not permitting an election
as to the propriety of undertaking the work are vicious, and
within the inhibition of the constitution. It does not militate
against this construction that the land owner may appear be-
fore the county court when the petition is presented, and re-
sist the application, or may contest the assessment upon his
property when made. Whether the contemplated work shall
be undertaken, and his property subjected to taxation, is not
made to depend upon his election, but upon the decision of
the court. It would be a solecism to call that privilege an elec-
tion.'

"At the same term of the court, the case of *Webster* v. *The
People* (unreported) was decided. That case related to the
above work undertaken under the authority of the county
court of Pike County. The efforts of the commissioners to
collect instalments of interest on the assessments were resisted
by certain land owners. The Supreme Court of Illinois said :
'The principal questions raised and discussed in this case are
the same as in *Updike* v. *Wright*, decided at the present term,
and for an expression of our views reference is made to the
opinion in that case. For the reasons there given, the judg-
ment in this case will be reversed, and the cause remanded.'

"It may be well to state in this connection that the Supreme
Court of the United States, in *Harter* v. *Kernochan*, 103 U. S.
562, 570, referring to section 5, article 9, of the Illinois consti-
tution, declaring that the corporate authorities of counties, town-
ships, school districts, cities, towns, and villages may be vested
with power to assess and collect taxes for corporate purposes,

has said : ' It is the settled law of the State, as heretofore recognized by this court, that this constitutional provision was intended to define the class of persons to whom the right of taxation might be granted, and the purposes for which it might be exercised, and that the legislature could not constitutionally confer that power upon any other than corporate authorities of counties, townships, school districts, cities, towns, and villages, or for any other than corporate purposes. *County of Livingston* v. *Darlington*, 101 U. S. 411;' *Weightman* v. *Clarke*, 103 U. S. 256, 259.

"After the above decision in *Webster* v. *The People*, certain land owners undertook to provide for the protection of their lands from overflow by the execution of deeds of trust to the commissioners. Under these deeds as much, perhaps, as $30,000 was raised and expended by the commissioners.

"In May, 1878, while those deeds were in force, Palms, on behalf of himself and others instituted a suit in equity in the Circuit Court of the United States for the Southern District of Illinois against the levee commissioners. The bill in that case recited the above legislation, and the proceedings resulting in the appointment of the commissioners, the assessments by the jury, and the issuing of bonds by the commissioners, and charged that the expense of the work was paid by the commissioners with money furnished by Palms and others, of which, it was alleged, the owners and occupants of the lands benefited and assessed were at the time well aware. Referring to the twenty-ninth section of the act of 1871, prescribing the duties of the commissioners, and also to the above act of 1872, that bill alleged that the commissioners made efforts ' to collect the amount of some of the instalments of said assessments, and the interest thereon, but the courts of the State of Illinois, before whom the question of the collection of such assessments and the instalments thereof under said statutes was brought, refused to give effect to the provisions of said acts, so far as they purported to authorize the collection of the same by the collectors of taxes under extensions on the tax books; and no means are left for the collection of such assessments and interest, except such as may be supplied by the general authority of

the courts that have jurisdiction of such questions. And your orator would further show unto your honors : That the whole amount of the moneys advanced by him, and by other purchasers of the bonds, with interest thereon, remains unpaid, and that said commissioners remain and continue in the actual use and possession of the said levee and other works constructed with the moneys borrowed of your orator and others; by the said commissioners, under the proceedings aforesaid ; and they do also, by and under the direction of the owners of said lands, keep and use the said works to protect their own lands, and the lands of the other owners and occupants, from overflow from said river. And your orator further shows unto your honors : That the said commissioners refuse to pay to your orator and the other holders of said bonds, the whole or any portion of their principal—money loaned to them for the purposes aforesaid, or interest, and they also refuse to enforce the collection of said assessments on the several tracts of land described in said Exhibit A, or the interest thereon, as it is their duty to do, and the owners and occupants of said lands refuse to pay said assessments, or the interest thereon, so that the moneys loaned by your orator for the construction of said works is wholly lost, together with the interest thereon. And your orator would further show unto your honors : That the owners and occupants of said lands are very numerous, as will appear by the lists of land and the names of the owners thereof, as stated and set forth in the said Exhibit A, and the names of many of them are unknown to your orator, but all of them reside in other of the States of the United States than the State of Michigan ; the greater number of them are residents and citizens of the States of Illinois and Missouri ; and that the said commissioners, John G. Wheelock, George W. Jones, and Benjamin F. Westlake are citizens of the State of Illinois, and of the Southern District aforesaid.'

" The relief asked was a decree directing an account to be taken of ' the moneys loaned and advanced ' by Palms to the commissioners, ' to be used by them in the purchase and acquisition of the lands required for the location and construction of the said levee and other works, and for the construction and

the completion of the said levee and all the works and improvements connected therewith, together with interest thereon at the rate of ten per cent per annum, according to the terms of said bonds and the coupons thereto attached ;' the amount due Palms being ascertained, then that such amount be adjudged a lien in favor of Palms 'upon the said levee and other works, and the lands acquired, owned, and held by the said commissioners for the site of said levee, and all other improvements, and upon the said assessments upon all of the said lands described in the said Exhibit A, for the benefits to said lands afforded by the said levee and other works, and the interest thereon ;' and that 'the said commissioners proceed at once, under the order and direction of your honors, to collect such assessments upon all and every of said tracts of land and the interest that has, or that may hereafter, accrue thereon, or so much thereof, from time to time, as will be sufficient to pay the interest money or the principal, payable to your orators as the same falls due; or that it may please your honors to appoint one or more competent persons, as receiver or receivers, to take possession and charge of the said levee and other works, and manage and control the same, together with all the books, papers, and properties of said commissioners, and with authority to collect, under the order and direction of this honorable court, the said assessments and interest thereon, as often and in such sums as may be sufficient to meet and satisfy the claims of your orators as aforesaid.'

" The commissioners answered in that case, insisting, among other things that the bonds in question having been registered with the auditor of public accounts under the act of 1872, they were not responsible for the failure to collect the money to pay interest, and were without any duty in respect to the said assessments. They referred to the fact that certain land owners had at all times opposed the proceedings instituted to assess their lands for benefits on account of the said levee, and refused to pay interest on assessments, in consequence whereof the township collector had returned nearly all the land owners involved in the proceedings as delinquents ; that thereupon the county collector made application to the Pike County Court to

enforce said assessments against the delinquent lands; that some of the land owners opposing the assessments filed objections to judgment for such assessments, setting up that the law under which the assessments were imposed was unconstitutional; that the commissioners employed counsel to prosecute the application for judgment and for the collection of said assessments, and the county court gave judgment against the lands; that the land owners appealed to the circuit court, which affirmed the judgment of the county court; that thereupon the land owners carried the case by appeal to the Supreme Court of the State, stipulating that one appeal should be decisive of all the assessments; that the commissioners themselves employed counsel in the argument of the case in the Supreme Court of the State, and said court decided adversely to the right to collect said assessments; and that such decision of the highest court of the State was decisive of any question of right on their part to enforce assessments. The case referred to by the commissioners in their answer was the above case of *Webster* v. *People*. The commissioners also averred that ' as such commissioners they are not now, and never have been, in any actual possession of any part of said levee or other work, except for the purpose of constructing, maintaining, and repairing the same; that they have never had title to any portion of the said levee, as they are likewise advised and believe on account of the unconstitutionality of the law under which said work was done; and that since said law was declared unconstitutional these respondents, as commissioners, have only exercised authority over said levee in warning parties against injuring said levee, but this was in their private capacity, at the request of a portion of the land owners, who supplied them with funds for that purpose, in whose behalf they have, in like private capacity, tried to keep said levee in repair.'

" On the 13th day of March, 1879, that cause was heard upon bill and answer in the Circuit Court of the United States. By that court it was adjudged and decreed ' that the said defendants [the commissioners] take, retain, and hold the right of way, levee, and other works and property in question, and described in the pleadings, and keep, take care of, preserve,

and protect the same, under the order and control of this court, for the benefit and on behalf of the complainant and all other parties interested therein, or who may hereafter be found to be interested in the same, in whole or in part.'

"It was further decreed 'that the complainants and all other persons who may have loaned or advanced money to the defendants for the acquisition by those of the said right of way, or for the construction of the said levee and other works and property connected therewith, or who may be the holder of any of the bonds issued by said defendants to raise money for the purposes aforesaid, or to pay for such right of way or the construction of such levee and other works, or to pay any of the proper expenses connected therewith, who may come into this suit, contributing their proper proportion to the expenses thereof, have liberty to go before the master and produce these said bonds and coupons for interest thereon, and make proof of the amount due them of principal and interest on account of such loans, advances, and bonds; and the cause is referred to John A. Jones, master in chancery, for the purposes aforesaid, who will, upon the application of the complainants, or other persons who may come into the cause as complainants upon the terms hereinbefore prescribed, and reasonable notice to the defendants or their solicitors, proceed to take the proofs of the amounts due to the complainants, and allow parties who may have before that time come into the cause, and, after such proofs are taken, make a report to the court of the amounts found by him to be due each and any party who may appear before him, and the ground, and facts of his several findings and conclusion;' and 'that after the coming in of the master's report of the amount or amounts found by him to be due to the complainant or other persons who may come into the cause as aforesaid, and the approval of said report, and the determination and adjustment by the court of the amount or amounts due to the complainant or other persons who may come into the cause for moneys advanced or loaned on bonds held as aforesaid, the said complainants or other persons have the liberty to exhibit and file their supplemental bill or bills against any or all the present or former

owners of the said lands alleged in said bill to be benefited by the said levee and other works, or who have heretofore or who may now be in any way interested in the said levee and other works, or the lands benefited thereby, to compel them to contribute to the payment of the amount or amounts which may be found due to the said complainant or other persons as aforesaid, and for such other and further relief as they may be advised they are entitled to; and the court reserves all other questions of relief to the parties, and of the costs, to be considered hereafter. And the said complainant is at liberty to use the names of the defendants in any such proceeding by way of supplemental bill, if they are advised it is necessary to do so, upon rendering them a sufficient indemnity against all costs and expenses.'

"The master to whom. the cause was referred to ascertain the amount of the several bonds and coupons made his report, showing the names of various persons, and the amount of bonds held by them, respectively. The amount reported as due to Francis Palms on the bonds held by him was $221,228.26. The total amount found due to him and certain parties who became co-plaintiffs with him in the cause was $304,908.26. In the decree confirming the master's report it was declared : 'And it is further ordered, adjudged, and decreed by the court that the said several sums of money so found to be due to the said complainants as aforesaid are a lien upon the assessments made under the order of the county court of Pike County, in the State of Illinois, upon the lands described in the bound book, Exhibit "A" with complainants' bill, and upon the said lands, as provided in the twenty-seventh and thirty-seventh sections of an act of the general assembly of the State of Illinois entitled "An act to provide for the construction and protection of drains, ditches, levees and other works," approved April 24, 1871. And it further appearing to the court that the defendants, commissioners under the several orders of the county court of Pike County, aforesaid, have no money in their hands for the payment of the amounts so found and adjudged to be due to the said several complainants, and it also appearing to the court from the allegations of the complainants' bill, and not denied by the said

defendants in their answer thereto, that they have taken no steps for the collection of the assessments made upon said lands for the repayment of the moneys borrowed by them, and the bonds and coupons issued by them, it was ordered by the court that the complainants have the right and liberty to proceed in this court, in the name of the said defendants as complainants as such commissioners, or in their own names as complainants, against the lands described in the said Exhibit "A," and the owners thereof, or such of such lands and the owners thereof, or other persons, and said commissioners, as they may be advised, are liable for or bound to pay the sums found to be due to the complainants as aforesaid, jointly or severally, by a bill or bills, original, supplemental, or otherwise, as they may be advised, for the recovery of the amounts found due them as aforesaid, and also for the costs of this suit.'

" It should be here stated that after the decision in *Webster* v. *People*, and after the institution by Palms of the suit in the Circuit Court of the United States, the following amendment to the constitution of Illinois was adopted: ' The general assembly of Illinois may pass laws permitting the owners of lands to construct drains, ditches and levees for agricultural, sanitary or mining purposes across the lands of others, and provide for the organization of drainage districts, and vest the corporate authority thereof with power to construct and maintain levees, drains and ditches, and to keep in repair all drains, ditches and levees heretofore constructed under the laws of this State by a special assessment upon the property benefited thereby.' 1 Starr & Curtis' Anno. Stat. Ill. p. 122.

" Subsequently the legislature of Illinois passed an act which took effect May 29, 1879, entitled ' An act to provide for the construction, reparation and protection of drains, ditches and levees across the lands of others for agricultural, sanitary and mining purposes, and to provide for the organization of drainage districts.' 1 Starr & Curtis' Anno. Stat. Ill. p. 919.

"  Some of the defendants in the present case made efforts to secure the passage of the act last referred to. That act provided for the formation of drainage districts with authority not only to construct drains, ditches, and levees for agricultural,

sanitary, and mining purposes, but also to maintain and keep in repair any such drains, ditches or levees ' heretofore constructed under any law of this State ; ' and, in cases where a levee had been theretofore built ' under any law of this State,' the annual assessment for keeping the same in repair was made due and payable on the first of September annually.

" Subsequently, on the 26th of January, 1880, some of the land owners whose lands were described and included in the original assessments and in the original bill filed by Palms instituted proceedings under the act of 1879. In their petition they described the route and terminus of the levee, alleging that the levee ' was constructed, under the laws of Illinois then in force, in the counties of Adams, Pike, and Calhoun, for the years 1872, 1873, and 1874.' They further alleged that, by proper repair and maintenance of the levee, the lands aforesaid (which are alleged to be part of the lands described in the original bill and in the present bill, amounting in the aggregate to about 90,000 acres) would be reclaimed and brought into cultivation ; that, in addition, it would greatly improve the sanitary condition of the locality through which the levee passed ; and that it was absolutely necessary for the health and proper drainage and protection of the said land that the levee be repaired as speedily as possible. They prayed that a drainage district, to be know as ' Sny Island Levee Drainage District,' be formed out of the lands subject to periodical overflow by the Mississippi River in the townships named, for the repair and maintenance of such levee, according to the statute ; that commissioners be appointed under the act of 1879, with directions to do all acts provided in the law for repairing levees, ditches, and drains, through assessments to be ordered ; and for other and further relief.

" Such proceedings were had that the county court of Pike County duly created the Sny Island Drainage District, and in 1880 it received the surrender of the levee from the original Sny Levee Commissioners, and now retains possession and control of the same.

" Palms died on the 24th day of November, 1886, more than six years after the last order made in the suit brought by him in the Federal court.

"The present suit was brought by his executors; the defendants herein being the surviving Commissioners, Wheelock and Jones, and numerous individuals who own lands within the territory described in the proceedings instituted in the county court of Pike County under the act of 1871.

"The bill proceeded upon the general ground that each tract of land in question was chargeable in equity with the amounts assessed against it under the act of 1871, with interest, and that the plaintiffs had a lien on each tract for such sums as had fallen due and might become due under such assessments. It alleged that each defendant owned or claimed one or more tracts (Exhibit 'A' showing a description of the various tracts, and the names of the persons against whom the assessments were made); that each defendant who acquired title to any of the lands after the assessments of 1872 and 1873 did so with full knowledge of such assessments and the above issue of bonds, as well as of the fact that the plaintiffs had purchased the bonds, and that the levee was constructed with the proceeds thereof; that, with like notice and knowledge, each of the defendants had appropriated and used the levee for the protection of their lands, and continued so to do; that all the defendants named in Exhibit 'A' participated in causing said bonds to be issued and sold, and the proceeds expended by actively soliciting the passage of the act of 1871; that before and at the passage of the act of 1871 the reclamation and protection of the lands described in that exhibit had been a subject of consideration and discussion amongst the owners and occupants of the same, as well as others, and it was understood by all parties interested in such lands that in order to reclaim and protect the same a statute was absolutely necessary, under the provisions of which the persons interested in the lands could be united and organized, and a common agency created, with authority to make all necessary plans, estimates, and contracts for the location of the levee, and to borrow money upon bonds or otherwise, to be secured by assessments or pledges of the lands benefited; that the defendants, through the agency of their co-defendant Charles M. Clark, had procured the passage of that statute, and caused its provisions to be made known to the

people interested, and thereupon devised a plan for the organization of a corporation composed of persons interested in the lands, for the purpose of raising money to put the act into effect; that a large number of the defendants subscribed to the capital of that corporation in order to effect the objects of its creation; that the other defendants purchased lands through such last-named land owners, with full notice of the equities of the plaintiffs; that all of the defendants who purchased after May 4, 1878, did so with full notice of said assessments, and that the same were unpaid, and also that said original suit in the Federal court was pending; that certain other defendants participated in causing the said bonds to be issued and sold to the plaintiffs' testator, and the proceeds thereof to be expended in the construction of the levee, and in causing the said assessments to be made by signing the original petition to the Pike County court in the year 1872; that certain other defendants purchased lands from other land owners who had joined in the petition, with full knowledge of what had previously taken place; that other defendants participated in procuring the bonds to be sold, and the proceeds to be expended as stated, and in causing said assessments, by signing on the 20th day of November, 1874, a petition for a second assessment under the act of 1871; and that other defendants purchased from or through persons of the class last mentioned, with full knowledge of all the facts.

"The plaintiffs also alleged that certain named defendants, after the above decision by the Supreme Court of Illinois, knowing the levee to be constructed with the plaintiffs' money, and having full notice of all the facts, executed to Jones, Wheelock, and Westlake deeds of trusts; that said deeds were made for the purpose of defeating the claims of the plaintiffs, and it was stipulated between the trustees and the last named defendants that no part of the funds collected by the former should ever be applied to the payment of any indebtedness created by or on account of the original levee; that said deeds of trust continued in force until 1887, when the same were canceled, said Jones, Wheelock, and Westlake having, it is alleged, devised another scheme for defeating the claim of

the plaintiffs; and that certain other defendants purchased from defendants of the class last mentioned, with full notice of all the facts.

" It was further alleged that after the decree of March 13, 1879, namely, on January 26, 1880, certain defendants named filed a petition in the county court of Pike County setting forth that they owned certain lands, and alleging that a certain levee (the one heretofore described) had been constructed under the laws of the State of Illinois; that said petition set forth the purposes for which the levee had been constructed; that the same was in bad repair; that, in the faith that the same would be properly constructed and repaired, they had expended large sums of money, had improved farms, and that all such improvements would be washed away, unless the levee should be repaired and kept up; and that the lands subject to overflow amounted to an aggregate of 90,000 acres. The bill set forth the substance of the petition, and the various steps taken, as already stated, for the formation of a new drainage district, to be known as the ' Sny Island Levee Drainage District,' and alleged that all the defendants so joining had full notice of all the facts and of the making of the assessments aforesaid; that certain other defendants purchased lands from the defendants of the class last mentioned, with notice of all the facts; that certain other named defendants, pursuant to the statute of Illinois approved May 29, 1879, were severally made parties to, and had notice of, all the proceedings for the organization of the Sny Island Levee Drainage District, as well as of the contents of the petition therefor, and were bound by such proceedings and the appropriation of the levee aforesaid; that certain other named defendants acquired title to said lands, or interest therein, after July 26, 1880, and were bound by said proceedings and the appropriation of said levee; that certain other defendants named were heirs at law and took title to portions of said lands from ancestors who took part in some or all of the aforesaid proceedings; that certain other defendants had acquired title to some of said lands by accepting deeds of conveyance expressly recognizing the lien of plaintiffs on said tracts; and that every one of the present defendants had full

notice of the claims of plaintiffs and of the facts aforesaid; and that all of the defendants now appropriated said levee and other works and refuse to contribute anything to the payment of the plaintiffs.

"The bill alleged that the Sny Island Levee Drainage District had every year made large assessments, and, contriving and intending to defeat the plaintiffs, had caused many of the tracts of land to be sold for non-payment of such assessments (such sales, it was alleged, being merely colorable, as against the rights of the plaintiffs, and mere clouds on the title to said land); that before the construction of said levee the lands were wet, and not worth exceeding fifty cents per acre; that the average amount assessed against the lands for the cost of the levee was greatly in excess of the then value of the lands, but it was expected that the work would, when constructed, drain every tract, and so enhance the value of the same as to make the lands ample security for the money borrowed; that the plaintiffs, relying on this and on the assurances of the land owners and commissioners, purchased the bonds in question; and that the lands were enhanced in value by said expenditures until they became worth $25 per acre.

"It was also alleged that, if the levee had been kept up, it would have afforded full protection, and would have caused the lands to have continued to be good security; that defendants had spent some money in repairing said work, but made such improvements and repairs so unskillfully that they were insufficient; and that by neglect of defendants the lands had again become wet and overflowed, and were not now good security for the plaintiffs.

"After stating that the defendants were, by reason of the matters and things set forth in the bill, bound to preserve, protect, improve, and repair the said levee and other works described, by sufficient contribution in money, ratably or otherwise, and by further assessments upon the lands, in order to protect and keep the security of the plaintiffs adequate and sufficient, the plaintiffs prayed that by the appointment of a receiver with ample powers, and by other appropriate order, the defendants should be compelled to preserve, protect, repair, im-

prove, and make said levee and other works protective of said lands, 'or to give and confer upon such receiver the power to make needful assessments upon said lands in proportion to benefits and the relative value of each tract thereof, and with the money arising therefrom, or by the mortgage of such assessments and the lands upon which they are made, raise the money necessary for the repair and improvement of the said levee and other works, and with the money so raised proceed to repair and improve said levee until it is made adequate for the drainage and protection of all of the said lands;. that each and every of said defendants herein may be enjoined by this honorable court from selling, transferring, or assigning the title to said lands owned by them, or any part thereof, upon which any of said assessments may rest, except subject to the lien of said assessments, as the same shall be determined by this honorable court, or in any manner whatsoever changing, altering, or affecting the title thereto so as to in anywise impair, diminish, hinder, or prejudice the lien of said assessments thereon, or on any portion thereof, and that the Sny Island Levee Drainage District, its officers and agents, be enjoined from selling or offering for sale any lands covered by any of the assessments herein in question, for any pretended assessments or alleged liens by said district attempted to be assessed, except subject to the lien of all assessments and liability on said lands, respectively, as the same shall be determined by this honorable court.'

"It was further asked in the bill that the court order, determine, and declare the amounts due to the plaintiffs and all other holders of bonds and coupons who would come in and contribute to the expense of this suit, 'and the amount due for principal and interest on the several assessments made against and upon each tract of land described in the pleadings and exhibits, and the proportion of the amount of such assessments upon each tract of land necessary to the payment of the amount of the principal and interest now due upon the bonds and coupons of your orators and others who may come into the cause and contribute as before mentioned, and that each of the said tracts of land be sold under the order and decree of this court for the amount chargeable upon and against the same, unless the

owner of the same, or some other person for him, shall, within a day limited, pay said amount, with a just proportion of the costs of this suit;' and also that the court would 'appoint one or more commissioners or receivers in the place and stead of the said John G. Wheelock and George W. Jones, or appoint a commissioner in the place of the said Benjamin F. Westlake, deceased; and, if one or more commissioners or a receiver or receivers are appointed in the place and stead of the said John G. Wheelock and George W. Jones, the said Wheelock and Jones may be ordered and directed to turn over and deliver to such commissioners or receivers so appointed all books, papers, documents, and property now in their possession or under their control.'

"The defendants demurred to the bill, and the demurrers were overruled. They subsequently filed answers, which put the plaintiffs upon proof of many essential allegations of their bill, without proof of which, independently of the question of law arising upon the face of the bill, no part of the relief asked could have been granted. In the view which is taken of the case by this court, it is unnecessary to extend this opinion by setting forth the averments and denials of the several answers.

"Upon final hearing the Circuit Court dismissed the bill."

*Mr. Henry M. Duffield* for complainants.

*Mr. Thomas Worthington* and *Mr. W. H. H. Miller* for certain respondents. *Mr. Asa C. Matthews, Mr. Harry Higbee,* and *Mr. J. Otis Humphrey* were on their brief.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

The Circuit Court held in substance, among other things, that the decretal order of that court on the bill first filed adjudging the amounts reported by the master to be due the several complainants and giving them liberty to file a supplemental bill against the owners of the lands benefited to compel them to contribute to the payments of the amounts thus reported, was not an adjudication which precluded the land owners from deny-

ing their liability; that as it was thirteen years after the act was declared to be unconstitutional and nine years after leave was given to file the supplemental bill, before any step was taken except as against those who were originally commissioners, there had been such laches as precluded complainants from having the relief sought, the conditions of the property and the relations of the parties having in the meantime greatly changed. The Circuit Court of Appeals held that even when exercising an independent judgment a Federal court should give effect to rules of construction previously established by the highest court of a State, and not act upon a different view unless compelled to do so to prevent an absolute denial of justice; that, applying the settled rule of construction of the State to the state constitution relating to the subject, the act of April 24, 1871, was unconstitutional, and assessments made thereunder were not enforceable; that the fact alone that land owners advocated and used their influence to secure the passage of a law under which bonds were issued, to be paid by special assessments against their lands, which law was subsequently declared unconstitutional, and the assessments void, did not afford ground on which a court of equity should declare a lien on such lands in favor of the bondholders, in the absence of fraud, and where both the land owners and the purchasers of the bonds acted in the mistaken belief that the bonds were valid; and that where bonds issued by commissioners in payment for the construction of a levee to protect lands from overflow, were void, a court of equity had no power to determine that certain lands received the benefit of the expenditure, and on that ground to declare a lien thereon in favor of the bondholders. The decree of the Circuit Court was not affirmed on the ground of laches, but the Circuit Court of Appeals nevertheless said (95 Fed. Rep. 110): "The plaintiffs can take nothing, as against the individual land owners, defendants in this cause, by reason of any order made in the suit instituted by Palms in the Circuit Court of the United States against the commissioners designated under the act of 1871; for the present defendant land owners were not parties to that suit, and could not be concluded by any order made in it. It is evident from the orders entered in that case that Judge

Drummond did not intend to pass upon the rights of the land owners, but was of opinion that if Palms had any ground of action against them, in respect of the lands attempted to be specially assessed under the act of 1871, he must bring them before the court by supplemental bill. He was given leave to file such a bill by an order entered in 1879. But he died in 1886 without availing himself of the privilege so given, although a large amount of interest was unpaid, and although nearly $100,000 of the bonds of the first issue had fallen due. The present bill was not filed until 1889,—about nine years after it could have been filed. If the case depended alone upon the question of laches, there would be strong ground for holding that the plaintiffs and their testator so long delayed the institution of proceedings against the land owners that a court of equity ought to decline giving them any relief. The application of such a principle would be peculiarly appropriate, because it is provided by statute in Illinois that no execution can issue upon a judgment after the expiration of seven years from the time it becomes a lien, except upon the revival of the same by *scire facias*, and that an action to recover real estate shall be barred by seven years' residence thereon under a title of record, etc.; by seven years' adverse possession under color of title and payment of taxes; or, as to unoccupied land, by seven years' payment of taxes under color of title. 2 Starr & C. Ann. Stat. Ill. p. 1386, c. 77, § 6; Id. pp. 1538, 1539, 1547, c. 83, §§ 4, 6, 7. In this case most of the defendants made proof of adverse possession. Besides, as said in *Johnston* v. *Mining Company*, 148 U. S. 360, 370, 'the mere institution of a suit does not of itself relieve a person from the charge of laches,' and 'if he fail in the diligent prosecution of the action, the consequences are the same as though no action had been begun.' "

The bill is stated by counsel to be a bill to "enforce severally against the lands of certain defendants the lien of separate assessments for the construction of the levee, with the proceeds of which the levee was built, upon the grounds, 1st, that such assessments were levied in strict conformity with the terms of the statute of 1871, which was a valid law; and, 2d, that even if that statute was unconstitutional, many of the defendants

owning such lands are estopped to deny the, constitutionality of said act and attack the assessments on that ground. It is not a bill to compel contributions to, or collect proportionate amounts of, a gross sum, but is a bill in the nature of a foreclosure bill to enforce, on the several and separate parcels of land, the liens of several and specific assessments upon the faith of which the moneys which built the levees were advanced."

It is insisted that it is not a bill to collect a tax, or a bill " to hold any municipal corporation or any individual liable, directly or indirectly, at law or in equity."

The bill purports to be an original bill in the nature of a supplemental bill, supplemental to the bill originally filed by Palms, either by way of enforcing the decretal order entered on that bill, treated as a final decree, or, treating that order as interlocutory merely, of obtaining a decree on the whole case as against new parties. Which view is taken is perhaps not material, for " where a party returns to a court of chancery to obtain. its aid in executing a former decree, it is at the risk of opening. up such decree as respects the relief to be granted on the new bill." *Lawrence Manufacturing Company* v. *Janesville Mills*, 138 U. S. 552, 561. And, moreover, the bill is an original bill as to the land owners.

Palms filed that bill, on behalf of himself and others similarly situated, May 4, 1878, against Wheelock, Jones and Westlake, as commissioners appointed under the act of April 24, 1871, praying that the moneys " loaned and advanced " by complainant to those commissioners be ascertained, and a decree entered that complainant was entitled to a lien on the levee, and other works and lands, acquired by the commissioners, and the assessments for benefits to said lands, which had been made; and further that the commissioners be decreed to proceed at once to collect the assessments, or so much thereof from time to time as would be sufficient to pay the interest and principal payable to complainant as the same fell due, or that the court appoint a receiver or receivers with authority to collect said assessments.

The commissioners were not impleaded as representing the land owners in the litigation. Their duties were such as the

act of 1871 defined, if that act were valid, and their powers were created and limited thereby, and did not include the power to bind all or any of the land owners of the district in such a suit. The suit was brought to compel the commissioners to discharge the duty, under the act, of enforcing the collection of assessments in the interest of the bondholders, as creditors, and in that sense, they occupied an adverse relation to the land owners who were *quasi* debtors.

The commissioners had filed in the county court of Pike County their assessment roll in 1872, and objections thereto by certain land owners having been decided adversely to them by the county court, and, on appeal, by the circuit court of the county, they took the case to the Supreme Court of the State, which decided that the act of 1871 was unconstitutional. This judgment was pronounced at January term 1876. It was after this that, interest being overdue on the bonds held by him, Mr. Palms filed his bill. Some other bondholders became parties complainant, and on March 13, 1879, an order was entered permitting complainants to bring the land owners into court and test the question of their liability, and the cause was referred to a master. July 7, 1880, the report of the master was confirmed and the court adjudged and decreed that there was due to Palms $221,228.66, and to various other complainants some thousands of dollars as specified, the whole aggregate sum found due complainants being $304,908.26, it being added: "The above amounts are found due without prejudice." It was further decreed that the sums of money found due were " a lien upon the assessments made under the order of the county court of Pike County, in the State of Illinois, upon the lands described in the bound book Exhibit A " as provided in the twenty-seventh and thirty-seventh sections of the act of April 24, 1871. The order proceeded that it appearing that the commissioners had no moneys in their hands for the payment of the amounts so found due, and that they had taken no steps for the collection of the assessments, it was further ordered by the court " that the complainants have the right and liberty to proceed in this court in the name of the said defendants as complainants and as such commissioners, or in their own names as

complainants against the lands described in the said Exhibit A
and the owners thereof, or such of such lands and the owners
thereof, or other persons, and said commissioners as they may
be advised are liable for or bound to pay the sums found to be
due to the complainants as aforesaid, jointly or severally, by a
bill or bills, original, supplemental or otherwise, as they may
be advised, for the recovery of the amounts found due them as
aforesaid and also for the costs of this suit." Both these orders
show that the Circuit Judge was of opinion that to subject the
lands to the assessments in that suit the land owners must be
made parties; and even the amounts found due were in terms
so found without prejudice to their rights.

No steps were subsequently taken, and Mr. Palms died No-
vember 24, 1886. His executors, on April 22, 1889, filed the
present bill against some thousand land owners of the district
as well as Wheelock and Jones, two of the alleged levee com-
missioners, Westlake in the meantime having deceased.

It was an original bill as to these new parties and they were
entitled to all the defences which existed when it was filed, and
were unaffected by the principle of *lis pendens.* The Supreme
Court of Illinois had held in 1876 that the act of April 24, 1871,
was in contravention of the constitution of the State and void.
This decision was made after the bonds in question had been
issued and purchased by Palms from the contractors, but the
judgment was rendered on objections by the land owners to the
confirmation of the assessments, the collection of which was re-
lied on for the payment of the principal and interest of the
bonds, so that it might well be held to be binding on the Fed-
eral courts. But we agree with the Circuit Court of Appeals
that even if the Circuit Court was not obliged to accept that
decision, yet that there was so little doubt of its correctness as
to require the same conclusion. The rulings of the state Sup-
reme Court were that the work of constructing a great levee
along the bank of a river subject to overflow, and independent
of a system of drainage, was not embraced within the act of
1871; that section 31 of article IV of the constitution of 1870,
that "The General Assembly may pass laws permitting the
owners or occupants of lands to construct drains and ditches

————— for agricultural and sanitary purposes across the lands of others," did not authorize the construction of a levee independent of drainage; that section 9 of article IX of that constitution was a limitation on the power of the Legislature, which could only vest such power in such municipalities and not in any other bodies, though other municipalities might be vested with jurisdiction to assess and collect taxes for corporate purposes subject to the rule of uniformity as to persons and property; and that the burden of taxation by special assessment could not be imposed on a locality without the consent of the taxpayers to be affected. And the court held, in respect of the act of 1871, " that neither the commissioners or the juries selected, nor the county court, is such a body as, under the constitution, may be given power to make local improvements by special assessments or by special taxation on contiguous property;" and also that " under this law, the people whose property is subject to taxation or assessments have never given any consent to it, if we exclude those who may have signed the petition addressed to the county court."

Section 5 of article IX of the state constitution of 1848 provided: " The corporate authorities of counties, townships, school districts, cities, towns, and villages may be vested with power to assess and collect taxes for corporate purposes; such taxes to be uniform in respect to persons and property within the jurisdiction of the body imposing the same."

Section 9 of article IX of the constitution of 1870 read: " The General Assembly may vest the corporate authorities of cities, towns, and villages with power to make local improvements by special assessment, or by special taxation of contiguous property or otherwise. For all other corporate purposes, all municipal corporations may be vested with authority to assess and collect taxes; but such taxes shall be uniform, in respect to persons and property, within the jurisdiction of the body imposing the same."

These provisions of the two constitutions are substantially identical; and while prior to the act of 1871, the clause of the constitution of 1870 had not been construed by the Supreme Court of the State, the similar provision in the constitution of

1848 had been construed in several instances. And it was ruled that the right of taxation could not be granted by the general assembly in any form to private persons, or to private corporations; that the provision limited the power of the general assembly to grant the right to assess and collect taxes to the corporate or local authorities of the municipalities or districts to be taxed; that a local burden of taxation or special assessment could not be imposed upon a locality without the consent of the taxpayers to be affected; and that corporate authorities were municipal officers directly elected by the people of the municipality or appointed in some mode to which they had given their assent. *Harward* v. *St. Clair and Monroe Levee & Drainage Company*, 51 Ill. 130; *Hessler* v. *Drainage Commissioners*, 53 Ill. 105; *Lovingston* v. *Wider*, 53 Ill. 302; *Wider* v. *City of East St. Louis*, 55 Ill. 133; *People* v. *Salomon*, 51 Ill. 37.

The construction of the state constitution in *Harward's* case and others has been repeatedly recognized by this court as authoritatively established.

And as this was the settled law of the State when these bonds were issued, and the constitution of 1870 admitted of no other construction, we concur in the opinion that the act of 1871 was repugnant to the constitution of Illinois; the bonds due under it were void; and the lands intended to be benefited could not be specially assessed by any action taken in conformity with the provisions of that act.

The case of *Blake* v. *People*, 109 Ill. 504, conducts to no other result. That case arose under the act of May 29, 1879, which was passed after the amendment of the state constitution adopted in 1878. That amendment provided that the general assembly might pass laws permitting the owners of lands to construct drains, ditches and levees across the lands of others, and to organize drainage districts and vest the corporate authorities thereof with power to construct and maintain levees, drains and ditches, "and to keep in repair all drains, ditches and levees heretofore constructed under the laws of this State, by special assessment upon the property benefited thereby." The new levee district was organized under this act to repair

the levee which had been built under the invalid law of 1871.
The objection was raised by a land owner, on the application
of the collector of the county for judgment against his land
on an assessment, that the old levee had not been built under
a law of the State within the meaning of the act and of the
constitution, because the act of 1871 was no law. The court
held that the point should have been raised before the con-
firmation of the assessment roll, and came too late. The
court also held that it could not take judicial notice that
the purpose for which the corporation was created was not
to keep in repair levees theretofore constructed under a law
of the State, but assuming the question to be properly before
the court, that while the act of 1871 was unconstitutional as
affecting those over whose lands the drains, levees, etc., were
to be constructed without the owners' consent, and those against
whose property it was proposed to assess the cost of construct-
ing such drains and levees without their consent, yet that there
might be some person so situated as to be precluded from rais-
ing the question of the validity of the law. And while, strictly
speaking, there neither was nor could be any levee in Illinois
constructed under a law of the State, yet that the legislature
plainly meant to authorize the completion and repair of levees
that had been constructed under an act purporting to be a law,
though it was not. The court said : "There was no law in
force authorizing the construction of levees over the lands of
others (save the act of April 24, 1871) at the time *Updike*
v. *Wright,* and *Webster* v. *Levee Commissioners,* were decided.
To obviate the effect of those decisions—allow the construc-
tion of levees, as well as drains, upon the lands of others—
and to authorize the formation of municipal corporations for
the purpose of constructing drains and levees, the amendment
to section 31, article IV, was submitted to, and adopted by, the
people, at the November election, in 1878. The act of May 29,
1879, but repeats, in this respect, the language of that amend-
ment. The levees, therefore, which must have been referred
to, because none other could reasonably have been intended,
were the levees which had been constructed, but could not be

kept in repair because of the decisions in *Updike* v. *Wright,* and *Webster* v. *Levee Commissioners.*"

The act of April 24, 1871, being invalid, the corporate existence of the levee commissioners, and the assessments made at their instance, and the collection of the latter under that act, or under the act of April 9, 1872, entitled " An act to provide for the registration of drainage and levee bonds, and secure the payment of the same," failed with it. But it is contended that while all this may be so as to the general public, yet that appellees, or some of them, have so conducted themselves that they are estopped from asserting such invalidity, and that the Circuit Court should have enforced the assessments exactly as if the law had been a constitutional enactment. The bill sought to collect not only the assessments already made, but asked to have further assessments made to pay the bonds in full, and to maintain and preserve the security; and the court was also asked to declare that the assessments created valid liens upon the lands, and to decree that the bonds sued on were a lien on the assessments and to enforce their collection. In other words, that the court execute the act, either as in itself wholly valid or valid as to these defendants. We are unwilling to assent to the doctrine of legislation by estoppel. The courts cannot, by the execution of an unconstitutional law as a law, supply the want of power in the legislative department.

In *South Ottawa* v. *Perkins,* 94 U. S. 267, this court said: " There can be no estoppel in the way of ascertaining the existence of a law. That which purports to be a law of a State is a law, or it is not a law, according as the truth of the fact may be, and not according to the shifting circumstances of parties. It would be an intolerable state of things if a document purporting to be an act of the legislature could thus be a law in one case and for one party, and not a law in another case and for another party; a law to-day, and not a law to-morrow; a law in one place, and not a law in another in the same State. And whether it be a law, or not a law, is a judicial question, to be settled and determined by the courts and judges. The doctrine of estoppel is totally inadmissible in the case."

In that case the invalidity of the law grew out of the fact

that the journals of the Senate and House did not show the passage of the bill as the constitution required it to be shown. Bonds had been issued, bought innocently, and the town had paid one installment of interest, but it was held that the bonds could not be sustained on the doctrine of estoppel. In this case the bonds were signed, issued and sold by the commissioners, and the interest which was paid was paid by the commissioners. The land owners had no control of the question whether bonds should be issued, and were not in privity of contract with the purchasers of the bonds. As the act, the assessments, and the bonds were void, the land owners, when it was sought to subject their property to those assessments for the payment of the void bonds, could not be estopped on the ground that the law itself, though void, was valid as to them.

Even in the instance of contracts of a corporation beyond the scope of its corporate powers, the law is well settled in this court that nothing which has been done under them or the action of the courts can infuse any vitality into them. *Central Transportation Company* v. *Pullman Company*, 139 U. S. 24.

*Daniels* v. *Tearney*, 102 U. S. 415, though not precisely in point, is illustrative of the distinction between enforcing an invalid law in an executory way, and awarding relief in respect of things accomplished under it. In that case, the secession convention of the State of Virginia had passed an ordinance providing that any person whose property had been taken on execution, might, by giving a bond for the payment of the judgment, have his goods released so long as the law should remain in force. Porter recovered a judgment against Daniels in the Circuit Court of Jefferson County, and Daniels availed himself of the ordinance by filing the required bond. To a suit brought on the bond by Tearney *et al.*, executors of Porter, after the close of the civil war, the defence was made that the law under which the bond was given was unconstitutional, and so that the bond was void. There was a difference of opinion in the court as to whether the bond was good as a voluntary bond or not, but it was held that conceding the bond to have been wholly void, the judgment upon it ought not to be reversed, on the principle that where a party has availed himself for his benefit

of an unconstitutional law he is estopped as between himself and others not occupying that position from setting up its unconstitutionality as a defence. The obligee of the bond sued on had not availed himself of the void ordinance, but was deprived of his rights by it. He had not in any way, expressly or impliedly, made himself a party to the illegal proceeding, or affirmatively agreed to take any advantage from it, while the consideration of the bond had been fully received by the obligor, who could not, under such circumstances, be permitted to deny a liability put upon the obligee *in invitum.*

It follows that this bill cannot be maintained on the theory of the validity of the act of 1871, even though some other equity might have been asserted if in the exercise of reasonable diligence. The result is not inconsistent with the cases that hold that although a law is found to be unconstitutional, a party who has received the full benefit under it, may be compelled to pay for that benefit according to the terms of the law. This is upon the theory of an implied contract, the terms of which may be sought in the invalid law, and which arises when the full consideration has been received by the party against whom the contract is sought to be enforced.

In the case before us, the land owners did not and could not receive the benefits which it was contemplated would accrue to them from the proceedings if they had been valid. As the Circuit Court of Appeals pointed out what the land owners, who promoted the passage of and proceeded under the act of 1871, had in view " was not simply to have a levee constructed, but to have a sufficient levee, which could be repaired from time to time and permanently maintained under legal authority." The scheme embraced not only the construction but the maintenance of the levee and must be looked at in its entirety. " If it be said that the plaintiffs' testator would never have purchased the bonds except in the belief that the act of 1871 was valid, with equal truth it may be said the land owners would never have sought nor desired such legislation except in the belief that the levee would be maintained by the same authority that constructed it." When the law fell, the method of maintaining it by compulsory process also failed, and if it be said that there

was only a partial failure of consideration, it is plain that the consideration was indivisible and not susceptible of apportionment, while the evidence demonstrates that the losses suffered by the land owners by reason of the breaking of the levee exceeded the amount of the bonds in question.

The grounds of estoppel claimed in this case seem to be, that one or more of the defendants secured the passage of the act of 1871; that others actively participated as petitioners and otherwise in the organization of the levee district before the bonds were issued; that others who took no part whatever in any of the proceedings, after the bonds were issued and the law was held to be unconstitutional, united in an attempt to maintain and repair the levee by voluntary contributions; that others, who neither said nor did anything, knowing that the proceedings were pending and that the levee was in course of construction, remained quiescent; that others paid interest on their assessments for the years 1873 and 1874; that others participated in the organization of the new and legal levee district after the constitution of Illinois had been amended and a law passed authorizing the formation of levee districts; and that others purchased lands after the *Webster* case was decided, and their deeds contained certain references to the act of 1871.

We think that the evidence fails to show that Palms relied, or had the right to rely, on the acts, or assurances, or silence, of any of these different classes of land owners, and was thereby misled. He purchased the bonds, not of the land owners, or any of them, nor from the levee commissioners, but in the open market, and on the advice of counsel as to the legality of the proceedings. The land owners who participated in any way in the creation of the drainage district were as vitally interested in the matter as any purchaser of bonds could be, and they acted equally in the mistaken belief that the law was valid. " It is a novel idea," as the Supreme Court of Illinois remarked in *Holcomb* v. *Boynton*, 151 Ill. 300, " in the law of estoppel that the doctrine should be applied to a person who has been guilty of no fraud, simply because, under a misapprehension of the law, he has treated as legal and valid an act void and open to the inspection of all." But we need not pursue the discus-

sion, for, in view of the invalidity of the proceedings, if complainants had a cause of action, that cause of action arose before May 4, 1878, when Palms filed his bill, yet the land owners were not proceeded against until the 22d of April, 1889.

The statute of limitations of Illinois provided that actions on unwritten contracts, express or implied, and all civil actions not otherwise provided for, should be commenced within five years next after the cause of action accrued. Courts of equity usually consider themselves bound by the statutes of limitation which govern courts of law in like cases. In the second aspect of their bill appellants did not rely on their bonds as legal instruments, but they sought the aid of a court of equity for the enforcement of a lien in payment of the bonds by reason of an estoppel *in pais*, and the cause of action so created would seem to have been barred by that statute. But courts of equity go farther in the promotion of justice, and where laches exist, deny the relief sought, even though the statutory period may not have run under the applicable statute.

The doctrine of courts of equity to withhold relief from those who have delayed the assertion of their claims for an unreasonable length of time is thoroughly settled. Its application depends on the circumstances of the particular case. It is not a mere matter of lapse of time, but of change of situation during neglectful repose, rendering it inequitable to afford relief.

Palms purchased these bonds of the contractors to whom they had been delivered by the commissioners, who assumed a right to issue and make that disposition of them by virtue of the power to borrow money granted by the act of 1871. The enterprise of erecting such a barrier to the incursions of the river was, in its nature, hazardous, and the levee required not only the utmost skill in construction, but the utmost effort and vigilance in its repair and maintenance. The transaction was in its nature speculative as the value of the reclaimed lands depended on the permanency of the structure.

The enforcement of the assessments for benefits on which the payment of the cost of the work depended was resisted from the first by certain land owners, who had opposed the scheme as attempted to be authorized, and their legality was brought

to the test as soon as in the orderly progress of judicial proceedings it could be done. The result was that in 1876 the act of 1871 was held void and the assessments illegal. In that same year the levee broke and the lands were devastated. In 1877 some of the land owners raised some thousands of dollars, giving trust deeds as security, for the repair of the levee, the money to be devoted to that purpose exclusively, and repairs were made.

May 4, 1878, Mr. Palms filed his bill, to which the land owners were not made parties. The principal of the first and largest assessment was payable one tenth annually beginning with 1882, but the interest, at the rate of ten per cent per annum from October 1, 1872, was collectible annually, and the interest on the bonds was also payable yearly. The instalments of interest for 1875, 1876 and 1877 had not been paid, and those succeeding remained unpaid.

In 1880 the Circuit Court entered the order permitting Palms to bring in the land owners by filing a supplemental or an original bill; and in that same year there were numerous breaks in the levee.

During the same year a new drainage district was organized under the provisions of the act of 1879, which had been passed in accordance with the constitutional amendment of 1878. Large assessments were levied upon the lands, aggregating hundreds of thousands of dollars, and the money was put into the property. In 1881 the levee broke again, but the new drainage corporation went on with its work. The levee broke again in 1888, and additional assessments were levied.

Palms did not avail himself of the order, in the original cause, of July 7, 1880. He took no further steps, and died November 24, 1886. His executors filed this bill April 22, 1889. The record affords no explanation of the delay, and it seems to us that this was such laches as forbid relief. To enforce these bonds against those by whose courage, energy and expenditure the lands have attained whatever value they now possess, would in our judgment be too inequitable to be permitted.

Mr. Palms knew of the decisions of the Supreme Court of Illinois in the *Webster* and *Updike* cases; of the breaks in the

levee; of the efforts of the land owners to rebuild and maintain it by large expenditures of money; and he could not lie by until after such expenditures, and with the condition of the district and the personnel of its people constantly changing, and then insist that during all this time the parties were under a liability to him which, in equity, they were estopped to deny.

So far as part of the old levee became part of the new levee, the new drainage corporation used it because they could not do otherwise, and besides Palms, as a purchaser of bonds in the open market, was a stranger to the work. Even if the contractors could have claimed an equitable lien on the structure itself, Palms could not, and, indeed, any resort to subrogation is disclaimed by appellants' counsel. Such a claim could not have been successfully maintained under our decision in *Ætna Insurance Co.* v. *Middleport*, 124 U. S. 534. There the town of Middleport had issued certain bonds to aid in the construction of a railroad; the road was constructed and the bonds delivered to the railroad company in payment of the work, and were afterwards sold to the complainant. The Supreme Court of the State of Illinois held the bonds void, and a bill was filed in the Circuit Court of the United States to enforce their collection on the theory of subrogation to the right of the railroad company to enforce the contract evidenced by a vote of the town appropriating the amount involved to pay for the railroad, and the acceptance and fulfillment of the contract by the railroad company. But it was decided that complainant having bought the bonds as negotiable securities from the railroad company, could not be substituted to any rights which it might have had against the defendants; that no right of subrogation existed; that subrogation was applicable only in cases where a junior incumbrancer was forced to pay off a superior lien for the protection of his rights, or in some similar case; and that a mere volunteer was not entitled to claim the right.

It is worthy of remark that the decree of the Circuit Court in that case was placed on the ground that the right of action of the railroad company, resting only in parol, was barred by the statute applicable to contracts not in writing. Blodgett, J., 31 Fed. Rep. 874.

Here no bonds were ever sold by the commissioners to Palms or any one representing him. They were delivered to the contractors and were taken in payment at ninety cents on the dollar of their face value. If the acts of any of the land owners created any equities against them it was in favor of the contractors, and these equities could not be asserted by Mr. Palms, unless by subrogation, which could not be availed of. And if it could be held that the money of Mr. Palms did enter into the construction of the levee, yet it was inextricably intermingled with that furnished by private individuals, by the new levee and drainage district, by three railroad companies, and by the United States government, the total aggregating half a million dollars, from 1877 to 1893.

In *Litchfield* v. *Ballou*, 114 U. S. 190, it was held that a creditor who had loaned to a municipal corporation, in excess of the amount of the indebtedness authorized by the constitution, money which had been used in part for the construction of public works, was not entitled to a decree in equity for the return of his money, because the municipality had parted with the specific money and it could not be identified; that a bill in equity praying for the return of specific and identical moneys borrowed by a municipal corporation from complainant in violation of law would not support a general decree that there was due from the municipality to him a sum named, which was equal to the amount borrowed; and further, that a constitutional provision forbidding the municipality from borrowing money operated equally to prevent moneys loaned to it in violation of this provision and used in the construction of a public work, from becoming a lien upon the works constructed with it.

And if in this case any ground of relief on the theory of implied contract ever existed, the want of diligence presented an insuperable bar to its assertion.

*Decree affirmed.*

Mr. Justice Brown did not hear the argument and took no part in the decision of this case.