## 13512

### EX PARTE SANDERS
### IN RE. SOUTH CAROLINA SAVINGS BANK
### IN RE. BAMBERG BANKING CO.

(167 S. E., 154)

*Messrs. Kearse & Kearse and R. E. Whiting,* for appellant,

*Mr. E. H. Henderson,* for respondents,

November 16, 1932.

The opinion of the Court was delivered by Mr. Justice Bonham.

The pleadings show that Bamberg Banking Company is a corporation which was engaged in the banking business at Bamberg. The 31st day of December, 1930, G. D. Sanders, petitioner and appellant herein presented at the window of the banking company for payment a check in the sum of $3,273.34, drawn by a customer of the Bamberg Banking Company, in favor of M. K. Sanders, who indorsed the same and delivered it to G. D. Sanders. The drawer of the check had in the banking company funds in sufficient amount to pay it. It was charged to the customer's account, and G. D. Sanders was given, and accepted, the sum of $100.00 in cash and a draft on the South Carolina National Bank of Charleston for $3,173.34. The Bamberg Banking Company

had to its credit with the Charleston bank more than sufficient funds to pay the draft. January 15, 1931, Bamberg Banking Company failed; closed its doors for business; and was taken over by the state bank examiner. The respondent South Carolina Savings Bank was appointed receiver of the closed bank, and is now engaged in the business of such receivership. When the Bamberg Banking Company closed its doors, G. D. Sanders had not presented to South Carolina National Bank of Charleston, for payment, the draft given on it by Bamberg Banking Company on December 31, 1930. When the banking company failed and closed its doors for business, G. D. Sanders presented his draft to the receiver, demanding that it be paid in full as a preferred claim under the provisions of the Act of the General Assembly approved March 28, 1930, 36 Stat., 1368. The receiver declined to pay the claim as one of preference. Thereupon the claimant filed his petition in the Court of Common Pleas praying that the Court issue its order commanding the receiver to pay the claim in full as one of preference. The receiver answered, denying petitioner's right of priority, for the several causes therein stated, and challenging the constitutionality of the Act of 1930, under the provisions of which petitioner claimed priority. The matter came on for hearing by Hon. T. M. Boulware, special Judge, upon an "Agreed Statement of Facts." Judge Boulware filed an order in which he held that the Act of 1930 was unconstitutional, predicating his conclusion upon the decision of this Court in the case of *Ex parte Wachovia Bank & Trust Company (Nettles v. People's Bank of Darlington)*, 160 S. C., 104, 158 S. E., 214, which decision declared the Act April 26, 1927 (35 St. at Large, p. 369), relating to the liability of banks doing business in this State when receiving for collection checks, or other negotiable instruments, to be unconstitutional. He also held that petitioner was not entitled to preference because the assets of the banking company were not swelled by reason of the

transaction of petitioner with it. From this order petitioner appeals upon three grounds, which may be thus briefly stated:

(1) That the Circuit Judge erred in holding that the Act of 1930 was not constitutional because that it violated Article 3, § 17, of the Constitution of South Carolina, which prescribes that an Act shall relate to but one subject, which shall be expressed in the title; (2) that his Honor erred in holding that the Act was unconstitutional because that it discriminated against corporations, partnerships, and individuals not engaged in receiving and paying deposits of money in this State; (3) that his Honor erred in holding that the petitioner was not entitled to a preference because the assets of the Bamberg Banking Company were not increased by petitioner's transaction with it.

The respondent gave notice that he would ask the Court to sustain the Circuit Decree on these additional grounds: (1) that the Act of 1930 is not applicable to the facts of this case, because the record shows that the appellant requested, or accepted, the draft in question, and that he had such an unconditional credit as makes the Act inapplicable to him; (2) that the appellant held the draft received by him from the Bamberg Banking Company from the 31st day of December, 1930, until the 15th day of January, 1931, the day upon which Bamberg Banking Company closed its doors for business, without presenting it to South Carolina National Bank of Charleston, on which it was drawn, for payment, which was such failure to exercise due diligence as debars him from the relief which he claims; (3) that his Honor should have held the Act of 1930, in question, to be unconstitutional, because that it violates Article 1, § 8, of the Constitution of South Carolina, because the preference therein provided for impairs the obligations of stockholders in regard to their liability in a closed bank, and also impairs the obligation of the contract with depositors who made their deposits before the passage of the Act.

The questions which challenge the constitutionality of the Act approved March 28, 1930 (36 Stat. pages 1368-1374) are disposed of, contrary to the contention of those who present the questions, by the opinion of this Court just filed in the case of W. H. *Witt, Receiver, v. People's State Bank of South Carolina,* 166 S. C., 1, 164 S. E., 306, 307, which opinion upholds the constitutionality of that Act. The facts of this case bring it, in all respects, within the purview of that decision, in so far as the question of constitutionality is concerned.

Let us, then, consider the other questions made by the appeal.

The appellant charges error to the Circuit Judge for that he held petitioner was not entitled to the preference which he claimed because the assets of the receivership were not increased by his transaction with the Bamberg Banking Company.

We find no error in this holding of the Circuit Judge. The petitioner presented his check for payment, and received $100.00 in cash and a draft on the South Carolina National Bank of Charleston for $3,173.34 in exchange. The check presented by petitioner to the Bamberg Banking Company was then charged to the account of the drawer, who was one of its customers; the bank's assets were reduced by that amount. Its draft for the like amount on the Charleston bank was never presented for payment, and hence never paid. When the Bamberg bank failed, the Charleston bank paid to the receiver the amount of $7,000-00, which the Bamberg bank had on deposit with it. This simply restored the status as it was when petitioner presented his check. The amount by which the bank's assets were depleted by charging the amount of the check to its customer's account was restored when the Charleston bank paid that amount to the receiver. Certainly the funds of the banking company were not increased by the transaction.

The first of the additional grounds for sustaining the decree of the Circuit Judge must be sustained. It is to the effect that the Act of 1930, herein under review, is not applicable to this case because the record shows that the appellant requested, or accepted, the draft on South Carolina National Bank of Charleston, and that he had such an unconditional credit as would make the Act inapplicable to him.

The provisions of the Act pertinent to and controlling this question are contained in subdivision 2 of Section 13. So much of the subdivision as applies here is set out in this language: "When a drawee or payor bank has presented to it for payment an item or items drawn upon or payable by or at such bank and at the time has on deposit to the credit of the maker or drawer an amount equal to such item or items and such drawee or payor shall fail or close for business as above, after having charged such item or items to the account of the maker or drawer thereof or otherwise discharged his liability thereon but without such item or items having been paid or settled for·by the drawee or payor either in money or by an unconditional credit given on its books or on the books of any other bank, which has been requested or accepted so as to constitute such drawee or payor or other bank debted [debtor?] therefor, the assets of such drawee or payor shall be impressed with a trust in favor of the owner or owners of such item or items for the amount thereof, * * * and such owner or owners shall be entitled to a preferred claim upon such assets. * * *"

Analyzed, that somewhat involved statement is reduced to this meaning: One who presents for payment at a bank an item drawn by one who has on deposit in the bank funds sufficient to pay it and the item is charged to the drawer or maker thereof, but the amount of the item is not paid to him who presents it, either in money or by an unconditional credit on the books of the payor bank, or on the books of

any other bank, and the payor bank fails, the owner of the item shall have a preferred claim upon the assets of the payee bank, unless he has been paid in money, or has requested or accepted an unconditional credit on the books of the payor bank or some other bank, etc.

Appellant comes directly within the exception. He received in money $100.00, and requested, or accepted, a draft on South Carolina National Bank of Charleston for the balance of the item, viz. $3,173.34. This was an unconditional credit on that bank given by the payee bank and accepted by appellant. The payee bank had in the Charleston bank the funds to meet the draft given to, and accepted by, appellant. He is not entitled to preference on this ground. If he had presented his draft to the Charleston bank, it would have been paid.

Nor is he entitled to preference under or by the provisions of subdivision 3 of Section 13 of the Act, which are as follows: "Where an agent collecting bank other than the drawee or payor shall fail or be closed for business as above, after having received in any form the proceeds of an item or items entrusted to it for collection, but without such item or items having been paid or remitted for by it either in money or by an unconditional credit given on its books or on the books of any other bank which has been requested or accepted so as to constitute such failed collecting or other bank debtor therefor, the assets of such agent collecting bank which has failed or been closed for business as above shall be impressed with a trust in favor of the owner or owners of such item or items for the amount of such proceeds and such owner or owners shall be entitled to a preferred claim upon such assets.  *  *  *"

Appellant may not claim a preference upon the assets of Bamberg Banking Company, because it is not an agent collecting bank of the M. K. Sanders check. It was the payee bank. The check was drawn upon it by one of its customers and was charged to that customer's account.

If it be attempted to be argued that he had a preferred claim against the South Carolina National Bank of Charleston on the ground that it is the payor bank of the draft given upon it by Bamberg Banking Company, the sufficient answer is that it has not received the proceeds of any item or items sent it for collection, nor has it failed, or closed its doors for business.

The question of due diligence in the presentation of a check or draft is a mixed question of law and of fact, to be determined by the law as applied to the facts of each case. The question of ordinary care (due diligence) as applied by the Act of 1930 to a bank receiving an item for deposit, or subsequent agent bank, for collection, is determined to be the presentation of the item by forwarding it by mail, or by presentation in person, not later than the next business day following the day after the item was received.

By analogy of reason it would seem that one who holds a draft for fifteen days after receiving it is guilty of want of ordinary care, or due diligence.

The Circuit Decree adjudges that the petition be dismissed, which conclusion is reached by unsound conclusions of law. Whilst concurring in that result, it is the judgment of this Court that the conclusions of law stated by decree are erroneous and are reversed. But the result of the holdings of the Court is to affirm the order of the Circuit Judge; therefore the appeal is dismissed.

MR. JUSTICE STABLER concurs in result.

MR. ACTING ASSOCIATE JUSTICE C. C. FEATHERSTONE, Circuit Judge concurs.

MR. CHIEF JUSTICE BLEASE and ACTING ASSOCIATE JUSTICE W. C. COTHRAN dissent.

MR. JUSTICE STABLER (concurring is result) : I concur in the result of the opinion of Mr. Justice Bonham upon the ground that under the facts of the case the statute upon which the appellant, Sanders, relies as giving him a pref-

erence is not applicable; nor is he entitled to a preference under any decision of this Court.

The dissenting opinion of the Chief Justice cites the decree of Circuit Judge Ramage in the case of *Witt, Receiver, v. People's State Bank of South Carolina,* 166 S. C., 1, 164 S. E., 306, 307, as authority for the position he takes that the Act of 1930 is applicable to the Sanders claim. The decree of Judge Ramage in the *Witt case* was adopted by this Court, and made its opinion. The citations relied upon by the Chief Justice are these:

"Judge Ramage pointed out that the Act of 1930 made 'no discrimination whatsoever in favor of the owners of items who sent them through a bank for collection as against those owners who presented them in person to the drawee bank,' and that 'section 13 dealing with insolvency and preference gives all classes alike—"the owners of the items" —the same right of priority.' "

The Chief Justice continues his quotation from the decree of Judge Ramage in these words:

"Judge Ramage also said in his decree that the 1930 Act 'is not limited to cases of collection, but embraces the whole subject of collection and payment,' and that the Act 'provides for one very common feature or incident to the mode of such payments, when such payment is made by giving a draft on another bank which is no good and fails to produce actual payment because of the intervening insolvency of the bank giving such draft.' "

Concede, if you please, all that is quoted from the decree of Judge Ramage, the sufficient answer is that it has no application to the facts of our case. At the very outset of his decree Judge Ramage said: *"The question involved is whether, when items are sent for collection to the bank upon which they are drawn, and such items are charged to the drawers or depositors and paid by the drawee bank by its cashier check, * * * and the drawee bank became insolvent before the check on the other bank was paid, where-*

*by payment of the last-mentioned check was refused, the owners of the items are entitled to priority of payment or only participate pro rata with other creditors.*" (Italics added.)

An examination of the transcript of record discloses that the items involved in the *Witt case* had been sent to the Bank of Swansea for collection.

Such is not the fact in the present case. It follows that the remarks of the Circuit Judge quoted by the Chief Justice have no application to our case, and are, so far as the *Witt case* is concerned, *obiter dicta*. They are unnecessary to the determination of that case, and not germane to the question involved in that case, as it is stated in the Circuit Decree. Hence they are not authority in this case.

MR. ACTING ASSOCIATE JUSTICE C. C. FEATHERSTONE, Circuit Judge (concurring): Sanders, who is claiming a preference, had a check for more than $3,000.00 given him by a depositor of Bamberg bank.

The check was good; he presented it, and at his request got part of it in cash, and the balance in a draft on a bank in Charleston.

He held the draft for about fifteen days, and then presented it to Charleston bank, when payment was refused, for the reason that, in the meantime, Bamberg bank had failed.

At the time draft was given him, and for many days thereafter, Bamberg bank had on deposit, in Charleston bank, sufficient funds to pay the draft, but payment was refused, because, at time of presentation, Bamberg bank had gone to the wall.

Sanders claims a preference out of the assets of Bamberg bank, first, under the Act of 1930 (now Section 6960, Code of 1932), and failing in that, a preference outside of that Act.

It is obvious, I think, that the Act of 1930 gives him no preference.

An analysis of the Act reveals that it provides a preference in two classes of insolvent banks: First, in a "drawee or payor Bank"; second, in an "Agent collecting bank, other than the drawee or payor."

The drawee or payor bank, in so far as Sanders is concerned, was the bank in Charleston, which has not failed.

He is claiming no preference there, and it is not necessary to discuss that situation; but it may not be unwise to analyze subdivision 2 of Section 6960, referring to drawee or payor bank, for the reason that many questions will arise in the future in reference thereto.

To get the benefit of subdivision 2, the claimant must show: That the drawee or payor bank has failed; that, before it failed, it had presented to it, for payment, an item drawn upon, or payable by or at such bank; that, at the time it had on deposit to the credit of the maker or drawer an amount equal to the item drawn; that it charged such item to the account of the maker or drawer before it closed; or that it otherwise discharged his liability thereon, but without such item having been paid or settled for by the drawee or payor; either in money, or by an unconditional credit given on its books, or those of any other bank at the request or with the consent of the drawer, so as to make such drawee or payor or other bank (debted) the creditor of the drawer.

The sentences are long and hard to understand without careful analysis.

Suppose we illustrate: Jones gives to Smith a check on the Bank of Commerce; Jones has funds in bank to meet the check; the check is presented, and Jones' account is charged with it; Bank of Commerce after this fails; it has not paid Smith his money in cash; nor has it, at the request of Smith nor by his consent, discharged the obligation of Smith in some other way, which he has agreed to or accepted. Then Smith has a preference in the "Drawee or Payor" bank.

The other class in which a preference is allowed is designated "an agent collecting Bank, other than the Drawee or Payor," which is provided for in subdivision 2 of the Act above referred to.

What are the requisites to a preference in such bank? Subdivision 3: It must be an agent collecting bank; it must fail; before it fails it must have received an item intrusted to it for collection; it must not have paid the item in money; or by an unconditional credit on its books, or the books of some other bank, at the request or with the consent of the owner—so as to constitute the collecting bank or some other bank the debtor of the owner of the item.

If the collecting bank gets the item for collection, collects it and then fails, the owner of the item has a preference, unless the agent collecting bank has paid it, either in cash or in some other way, which has been approved by the owner.

Collection, as agent, failure to pay, either in cash, or in some other manner, with the approval of the owner, insolvency. These are the requisites to a preference.

Illustration: Jones turns over to Bank of Commerce, for collection, a check; Bank of Commerce sends it for collection to Commercial bank, which collects it and then fails; Commercial Bank has the money which it collected, as agent It has not paid it in cash, or, in some other way, acceptable to the owner. Result—preference to Jones.

It is clear that Sanders cannot get a preference out of the assets of the Bamberg bank, by virtue of the Act.

That bank never had intrusted to it by Sanders an item for collection. As to him, it was not "An Agent Collecting Bank." It never collected a dollar for him; it never was asked to do so. He was paid his check across the counter in cash and draft on Charleston bank; he undertook to collect the draft himself. The draft was given him, at his request. and he accepted it.

He occupies no better position than if bank had paid him the whole check in cash and he had then used part of the cash to buy a draft on Charleston, and this is leaving out of consideration his laches in keeping the draft some fifteen or more days.

The law may work a hardship, but thus it is written; and it is not ours to make, but to interpret.

*Is Sanders entitled to a preference without the aid of the Act of 1930?* To sustain this position, he plants himself upon *Railway Express Agency v. Bethea,* reported in 165 S. C., 230, 163 S. E., 637, 638. At first blush it looks as though that case is conclusive in his favor. But a careful reading reveals that it was bottomed upon *Hampton Loan & Exchange Bank v. Lightsey,* 155 S. C., 222, 152 S. E., 425. And, when we go to that case, we find, beyond all doubt, that the preference was allowed solely upon the ground of subrogation; the elements of which were present, viz.: (1) That the party claiming it shall have paid the debt; (2) that he was not a volunteer but had a direct interest in the discharge of the debt, or lien; (3) that he was secondarily liable for the debt or the discharge of the lien; (4) that no injustice will be done to the other party by the allowance of the equity *Enterprise Bank v. Federal Land Bank,* 139 S. C., 397, 138 S. E., 146.

If we go to the facts in the instant case, we will search in vain to find the elements: (1) Sanders did not pay any debt due by Bamberg bank to Charleston bank. There was no such debt, for the Charleston bank was debtor to Bamberg bank; (2) if there had been such a debt, Sanders was in no way bound for it secondarily or otherwise; (3) if he is given a preference, injury will be done to the creditors of the bank.

Mr. Justice Stabler, speaking in the *Bethea case,* expressly states that it is decided upon the authority of the *Lightsey case.*

I have not access to the record in the *Bethea case,* but the

opinion contains this statement: "The correspondent banks also held securities of the Dillon bank;" so unquestionably, one of the elements of subrogation was present to wit, indebtedness by Dillon bank to the correspondent banks, upon which the express company bought the checks.

Again the statement is made that the express company presented the checks promptly to the banks upon which they were drawn.

Subrogation is a mere creature of equity and subject to equitable principles; and "equity aids the vigilant." A person who loses by his own laches cannot invoke the doctrine. The party seeking subrogation must not be guilty of laches. 37 Cyc., 373; Id. 383.

"The right to subrogation, being one of equity merely, must ordinarily be exercised with due diligence. It may be lost through laches." 99 Am. St. Rep., 482, Note. See, also, 66 Am. St. Rep., 523, Note.

It will not be applied, when it will injure others.

There can be found no better statement of the rule as applied to the facts of the instant case, than that given by Mr. Justice Woods, in *Livingstain v. Columbian Banking & Trust Company*, 77 S. C., 305, 310, 57 S. E., 182, 184, 22 L. R. A. (N. S.), 442, 122 Am. St. Rep., 568.

"But the issue here is not between the petitioners and the Bank of Commerce or the Columbian bank as a solvent institution, able to pay all creditors, but it is between the creditors of the Columbian bank, an insolvent institution, and the petitioners, who are claiming a preference in the distribution of the assets.

"No rule of equity appeals more to the judicial conscience than that which requires the assets of an insolvent corporation to be distributed ratably among creditors. Against this equity there is no principle of subrogation which can avail petitioners." And the doctrine embodied in that language has been recognized by our Supreme Court time and time again.

It is quoted by Mr. Justice Cothran in the *Lightsey case;* but held not to apply because it did not appear that the Hampton Bank was insolvent at time right to subrogation arose; and, that the right having matured before the Receivership, the receiver took the assets of the bank subject to it.

Having shown, I venture to think, that Sanders is not entitled to a preference on the ground of subrogation, then upon what ground can he get it?

He cannot get it upon the doctrine that the draft amounted to an assignment *pro tanto* of the fund; for that rule was changed by the Negotiable Instruments Act of 1914 (28 St. at Large, 668). This being so declared in *Peurifoy, Receiver, v. First National Bank of Batesburg,* 141 S. C., 370, 386, 139 S. E., 793.

Before the Circuit Judge, the only ground upon which he (Sanders) rested his claim to a preference was that the effect of the course of dealing between him and the bank was to swell the assets of the bank.

Counsel for receivers makes the point that, such being his only claim in the Court below (outside of his claim under the Act of 1930), he cannot now avail himself of other grounds, no notice being given to that effect. And in this I think counsel is correct. It is not necessary to argue that there was no swelling of the assets. A statement of the facts shows to the contrary.

The check that he presented was one drawn by a depositor; it was charged to account of depositor, and, in so far as the assets were concerned, they remained the same. Not a dollar of new money went into the bank.

In the *Bethea case* the assets were swelled. The statement is made that the agent bought the checks with cash, and checks which he had accumulated as agent. There is nothing in the opinion to show that the checks were on the Bank of Dillon. Assuming that they were not, then he paid all

cash for the exchange, thereby swelling the assets to the extent of his entire purchase.

If we assume that the checks were on Bank of Dillon, then the assets were increased to the extent of the cash paid.

My conclusion is that Mr. Sanders is not entitled to a preference—with or without the Act of 1930—and that he must share ratably with the general creditors.

MR. CHIEF JUSTICE BLEASE (dissenting) : This appeal involves the right of the petitioner, G. D. Sanders, who is appellant here, to a preferred claim upon the assets of the Bamberg Banking Company, an insolvent banking corporation. His claim arises out of certain facts, admitted by all the interested parties, as follows:

On December 31, 1930, G. D. Sanders, in person, presented to the bank a check drawn by one of the depositors of the bank against his deposit account for $3,273.34, payable to M. K. Sanders and properly indorsed by the payee. At the time the bank had plenty of cash in its vault to meet the payment of the check. It also had on deposit to its checking account in the South Carolina National Bank of Charleston approximately $42,000.00. It did not at the time owe any bills payable. The check presented by the petitioner was charged to the account of the drawer, and the bank made settlement therefor by giving the petitioner $100.00 in cash and its draft on the South Carolina National Bank in the sum of $3,173.34, and, when that draft was issued, correct charge was made on the Bamberg bank's books against its checking account at the South Carolina National Bank.

The Bamberg bank closed its doors on January 15, 1931, and on that day still had on deposit to its credit on the books of the South Carolina National Bank around $7,000.00 The draft for $3,173.34, issued to the petitioner, had not been presented for payment by him, and neither had it been accepted or certified; accordingly, the amount of the draft drawn by the Bamberg bank in favor of the petitioner had not been charged on the books of the South Carolina Na-

tional Bank against the Bamberg bank's account. The officials of the Bamberg bank had not been informed, however, that the draft on the Charleston bank had not been paid until after the Bamberg bank had closed, and therefore,. as to the Bamberg bank and its officials, the balance of the Bamberg bank on deposit in the Charleston bank was $3,-173.34 less than the credit balance shown by the books of the Charleston bank. Shortly after the closing of the Bamberg bank, petitioner presented his draft to the Charleston bank, but payment was refused; the sole ground therefor being the reason that the Bamberg bank had closed.

A receiver was appointed for the Bamberg bank, and the funds of that bank on deposit in the Charleston bank were turned over to him. Included in such funds was the amount of the unpaid draft issued to Sanders; so the receiver obtained possession of $3,173.34 more in cash than would have come into his hands if the petitioner had presented the draft of the Bamberg bank for payment before it closed.

The petitioner took the position that the transaction in which he received the draft drawn on the Charleston bank did not in anywise constitute him a depositor or creditor of the Bamberg bank, but the draft given to, and accepted by, him was given in lieu of cash, with the full intent on the part of the bank and himself that the bank's funds on deposit in the Charleston bank should be charged with the payment of the draft. He filed with the receiver his claim, asking that the draft be paid as a preferred claim, but the receiver refused to allow the claim for preference. Thereafter proper suit was brought by the petitioner to establish his claim for preference; he asserting 'that under the laws of this State," and, particularly, under the Act of the General Assembly, approved March 28, 1930 (36 Stats., 1368), entitled "An Act to Expedite and Simplify the Collection and Payment by Banks of Checks and Other Instruments for the Payment of Money" (Sections 6948-6963. 1932 Code), "the said claim is entitled to preference."

Upon the agreed statement of facts, the Special Judge, Hon. T. M. Boulware, who heard the cause, sustained the position of the receiver that the Act of 1930 was unconstitutional, and he held that, in the absence of statutory authority, the claimed preference could not be allowed, for the reason that the assets of the receivership had not been swelled.

The petitioner appealed to this Court from the order of the Special Judge, on the ground that he was in error in holding the Act of 1930 to be unconstitutional, and on the further ground that he erred in his holding that the petitioner's right to preference did not exist, independently of the statute, because the assets of the receivership had not been swelled.

The receiver, as sustaining grounds for the upholding of the order appealed from, in addition to his claim that the statute was unconstitutional, urged that the Act of 1930 was inapplicable to the facts of this case, since the petitioner had requested, or accepted, the draft in question, and that the petitioner's delay in presenting the draft constituted such laches as to deprive him of any right to a claim for preference.

We first heard the appeal at the November, 1931, term of the Court. At that time, the point was made by counsel for the receiver, apparently for the first time in the cause, that the presentation of the depositor's check over the bank counter took the case out of the application of the provisions of the Act of 1930, and therefore the petitioner-appellant is not entitled to the benefit of the provisions of that Act.

After some consideration of the issues involved in the appeal, we set the case down for reargument on this particular issue: "Is the appellant, Sanders, entitled to a preference independently of the 1930 Act?"

At the instance of the appellant's counsel, we later granted permission for them to discuss, also, in the reargument of the cause, the Act of 1930, with especial reference to the

position taken in the argument of respondent's counsel that the Act was limited in its application only to checks presented through banking channels.

Realizing that the main question involved in the appeal is of very great importance, the Court has taken much time to consider and determine it.

Our recent decision in the case of *Ex Parte Witt, Receiver, v. People's State Bank of South Carolina et al.*, 166 S. C., 1, 164 S. E., 306, 309, which was filed on the day the reargument of this case was heard, has determined all questions relating to the constitutionality of the Act of 1930. The decree on circuit of his Honor, Judge Ramage, in the *Witt case* was adopted and approved by this Court. If the reasoning of that decree, which was evidently also approved by us, is now followed, what was said there would appear also to determine any controversy concerning the application of the 1930 Act to the facts of the case at bar, for in his decree Judge Ramage pointed out that the Act of 1930 made *"no discrimination whatsoever in favor of the owners of items who sent them through a bank for collection as against those owners who presented them in person to the drawee bank,"* and that *"Section 13 dealing with insolvency and preference gives all classes alike—'the owners of the items'—the same right of priority."* Judge Ramage also said in his decree that the 1930 Act *"is not limited to cases of collection, but embraces the whole subject of collection and payment,"* and that the Act "provides for one very common feature or incident to the mode of such payments, when such payment is made by giving a draft on another bank which is no good and fails to produce actual payment because of the intervening insolvency of the bank giving such draft."

There was also on the part of Judge Ramage a suggestion, and to our mind a proper one, that the underlying reason of the 1930 Act, manifestly applicable to checks presented over the counter, as well as to those presented through

banking channels, was that *"it would defeat the banking system to require payment in currency of every item."*

It seems to us, therefore, under the language of the opinion in the *Witt case,* that there is no basis of differentiation to justify the excluding of the petitioner from the benefit of the provisions of Section 13 of the Act of 1930; for that section, as construed in the opinion, has definite application to *all owners of items* presented for payment at the insolvent bank, irrespective of the mode of presentation adopted by any of such owners.

The right of preferment, under the provisions of Section 13 of the Act, must be interpreted and given effect in connection with the general rule of the law declared in the Negotiable Instruments Act, which provides that "A check must be presented for payment within a reasonable time after its issue or the drawer will be discharged from liability thereon *to the extent of the loss caused by the delay."* (Italics added.) Section 6937, Code of 1932.

The reason for this provision is that a check, while not of itself operating as an assignment of funds, "however, may properly be regarded between the parties *as something of an appropriation to the payee* of so much money on deposit in the bank, which the payee may obtain by calling for it." (Italics added.) *Anderson v. Elem,* 111 Kan., 713, 208 P., 573, 23 A. L. R., 1202. The effect of that provision in the law seems to us to be well stated in Ruling Case Law in the following language: "If a check is not presented within the time fixed, and there is a loss due to delay, such loss falls on the holder of the check. * * * But it is now established by the overwhelming weight of authority, and beyond contradiction, that delay, short of the period prescribed by the Statute of Limitations for an action on the check or the original consideration, in presenting a check to the drawee for payment, does not release the drawer from liability, either on the check or on the original consideration for which it was given, *unless he is damaged or prejudiced*

*by such delay*. And in a suit upon such a check against the drawer, a plea by him, alleging the delay, but silent as to loss, is properly stricken on demurrer." 5 R. C. L., 511. (Italics added.)

To the same effect is the language of Mr. Justice Field for the Supreme Court of the United States that *"the drawer is not discharged by the laches of the holder in presentment for payment, unless he can show that he has sustained some injury by the default."* (Italics ours.) *Bull v. First National Bank of Kasson,* 123 U. S., 105, 8 S. Ct., 62, 64, 31 L. Ed., 97. See, also, 21 R. C. L., 65; Morse on Banks and Banking (6th Ed.) Vol. 1, § 421; note, page 881, 4 A. L. R.; *Anderson v. Elem, supra; Nuzum v. Sheppard,* 87 W. Va., 243, 104 S. E., 587, 11 A. L. R., 1024.

If the drawee bank, the Charleston bank, had closed before the presentation of the draft on the part of the petitioner, there would be, perhaps, serious question as to the right of the petitioner to recover against the drawer bank, the Bamberg bank. The petitioner took the risk that might have been as to the closing of the drawee bank, but the drawee bank did not 'close. It was the bank that issued the draft that failed. The statutory provisions intended to safeguard the drawer of the check from the risk of loss not due to the drawer's fault, but to the fault of the payee, are clearly without application here to deprive the payee of the draft of any right thereunder.

It seems equally clear that the doctrine of laches, as applied to the enforcement of equitable rights, does not apply to deprive the petitioner of any right to preference he may have either under the provisions of the 1930 Act or under the doctrine of equitable assignments, for, said Chief Justice Fuller of the Supreme Court of the United States: "The doctrine of Courts of equity to withhold relief from those who have delayed the assertion of their claims for an unreasonable length of time is thoroughly settled. Its application depends on the circumstances of the particular case. It

is not a mere matter of lapse of time, but of change of situation during neglectful repose, rendering it *inequitable. to afford relief.*" (Italics added.) *O'Brien v. Wheelock,* 184 U. S., 450, 22 S. Ct., 354, 370, 46 L. Ed., 636. See, also, Pomeroy's Equity Jurisprudence (4th Ed.), § 1442.

But, even if the provisions of the 1930 Act do not sustain the appellant's right to a preference, he is, nevertheless, entitled to one, under the decisions of this Court, on the admitted facts and circumstances under which he was given, and received, the draft in question. We do not see how it is possible to distinguish the legal principles involved here from those recognized and declared in the following decisions of this Court: *Railway Express Agency v. Bethea,* 165 S. C., 230, 163 S. E., 637, 638. *Hampton Loan & Excange Bank v. Lightsey, Receiver,* 155 S. C., 228, 152 S. E., 425, 427. *Ex Parte Berger,* 81 S. C., 244, 62 S. E., 249, 22 L. R. A. (N. S.), 445. and *Livingstain v. Columbia Banking & Trust Co.,* 77 S. C., 305, 57 S. E., 182, 22 L. R. A. (N. S.), 442, 122 Am. St. Rep., 568. All these cases have been under such recent review and consideration that it seems unnecessary to discuss them in an extended manner.

All the cited cases have fully recognized the principle of equitable charges or rights, arising from circumstances connected with the giving of the checks in question, that is not at all dependent on the rule existing in this State prior to the adoption of the Negotiable Instruments Act in 1914, which was that a check was, of itself, a legal assignment *pro tanto* of the deposit account on which it was drawn. The rule, while still existing and in force at the time of the decisions in the *Livingston* and *Berger cases,* was held inapplicable in those particular cases because of appropriation of the drawee bank of the deposit account on which it had a prior lien. Therefore it became necessary for this Court, in the *Livingston* and *Berger cases,* to consider the rights of the holders of the checks from a standpoint of equitable con-

sideration, and that consideration governed the Court in the conclusions reached in the decisions.

The *Lightsey* and *Bethea cases, supra,* arose long after the passage of the Negotiable Instruments Act. The decisions in those cases, giving the holders of checks rights of preference in assets of the bank over the depositors and general. creditors of the insolvent bank, were based *solely on equitable considerations* arising out of the circumstances connected with the giving of the checks, which were quite similar to the admitted facts in the present case. In the *Lightsey case* it was pointed out that the receiver "takes over the assets of the bank with its concomitant burdens," and "can have no higher right" than the insolvent bank had. It was also pointed out that the transaction in which the draft was issued "was practically a cash transaction, a substitute for cash, the benefit of which the Hampton bank immediately received by lessening its liability to its depositors whose checks were charged up to them." The right of subrogation, properly discussed in the decision, was, of necessity, dependent on the finding that the draft, considered in connection with all the circumstances under which it was given, *was an equitable assignment of the funds on which it was drawn.*

A situation similar to that involved in the *Lightsey case* existed in the *Bethea case,* where the checks of customers drawn on the bank issuing the draft constituted part of the consideration for the purchase of the draft. It was pointed out in the opinion in that case that the checks drawn on the issuing bank "could have been collected before the purchase of exchange was made; the parties to the transaction in such case merely waiving the actual delivery and redelivery of cash." The right of subrogation was not involved in the decision as the funds turned over to the receiver by the drawee bank were sufficient for the payment of the dishonored drafts. The claim was held, under the circumstances,

to be "a preferred claim and *entitled to payment in full.*" (Italics added.)

A similar viewpoint, giving effect to the doctrine of equitable assignments, has been accepted and expressed in quite a number of recent leading cases, many of them well considered, from other jurisdictions, where it has been held that, notwithstanding the Negotiable Instruments Act, the giving of a check, *together with the surrounding circumstances,* may amount to an assignment *pro tanto* of funds in the bank on which drawn. See *Federal Reserve Bank v. Peters,* 139 Va., 45, 123 S. E., 379, 383, 42 A. L. R., 742. *Central Trust Co. v. Bank of Mullens,* 108 W. Va., 12, 150 S. E., 137. *Salzburger Bank v. Standard Oil Co.,* 173 Ga., 722, 161 S. E., 584, 589. *Fourth Street Bank v. Yardley,* 165 U. S., 634, 17 S. Ct., 439, 41 L. Ed., 855. The governing principle, justifying those decisions, is made very clear and exceedingly well stated in Morse on Banks and Banking (6th Ed.), Vol. 2, p. 1116, where, in a discussion of the right of check holders as between the drawer and payee, the author says:

"The same reasons of good faith and security in business transactions which induce the law to sustain a bona fide sale of property, or assignment of bills or notes, against a subsequent assignee in insolvency of the assignor, apply to the case of a check.

"A vast amount of business is done by checks. *It would not be good faith in the drawer to withdraw his funds after giving the check,* and it is elementary law that, in an assignment for the benefit of creditors, the latter have no greater rights than the assignor except in case of an illegal transfer." (Italics ours.)

In the case of *Burrows v. Burrows,* 240 Mass., 485, 137 N. E., 923, 20 A. L. R., 174, there is found a very clear illustration of a proper application of the provision of the Negotiable Instruments Act that a check does not of itself operate as an assignment of funds. In that case the defendant

had received a check from her mother *as a gift,* which she cashed after her mother's death. The Court held her accountable for repayment of the amount of the check to the estate of her mother. In the opinion, it was pointed out that there was no evidence to warrant a finding of *any valuable consideration* for the delivery of the check.

In the *Salzburger Bank case, supra,* the Court points out that *by clear implication* the provisions of the Negotiable Instruments Act *recognize equitable assignments,* and further said: "The provision that they do not by themselves operate as equitable assignments *clearly implies* that they, *when taken with other facts,* may operate as such equitable assignments." (Italics added.) The positive statement is made in the opinion that "our Negotiable Instruments Law was not intended to, and does not, abrogate equitable assignments and implied trusts as they existed at the time of its passage." In that exceedingly well-considered opinion, the Court stated the following conclusions: "The transaction in this case clearly operated as an equitable assignment of the funds of the 'drawing bank in the drawee bank to the extent of the amount of the checks drawn by the drawer upon the drawee. * * * It would be inequitable and unjust, under these circumstances, to permit the bank to hold these funds and not to pay these checks. *Creditors of a bank do not stand in any better position than the bank itself, and should not be permitted to take these funds away from the plaintiff.*" (Italics added.)

In the case of *Federal Reserve Bank v. Peters, supra,* where the bank draft was issued in remittance for the collection made of a customer's check, it was held that, as the giving of the draft was a substitute for cash, the deposit was impressed with a trust for the payment of the draft. In stating the consideration leading to such conclusion, it was pointed out, as a highly evidentiary circumstance of the nature of the transaction, that the cashier of the remitting bank deducted the amount of the remittance from

the apparent balance due from the bank upon which the draft was drawn, "just as if this amount had already been withdrawn from the latter bank and transferred." This circumstance was considered sufficient to establish the intention of the cashier to set apart such portion of its balance in the drawee bank as was necessary to meet the draft.

Similarly, in the case at bar, the bank draft received by Sanders in settlement for the check drawn on the bank was issued as a substitute for cash; and Sanders took it upon the faith of its collectability from the drawee bank. The draft given and received under such circumstances (Sanders parting with his property in the depositor's check) implied the understanding of the transaction that the draft was good; that the issuing bank had funds with the drawee bank, subject to its checking account, sufficient for payment; and that sufficient funds from said account to meet the payment would be devoted to that end and not used for any other purpose. This intent of the transaction, to make an appropriation of the deposit account *pro tanto* to meet payment of the check when presented, was still further evidenced on the part of the issuing bank in the entry made on its books which depleted by the amount of its check its apparent balance at the drawee bank.

We cannot agree with the view advanced by respondent's counsel that the deposit account might still be regarded and treated as rightfully subject to the bank's control, and to its rights, at will, to withdraw the deposit account without leaving sufficient funds to meet the outstanding draft. It is true that, under the provisions of the Negotiable Instruments Act, a bank draft is not of itself a legal assignment of any part of the funds upon which the draft was drawn. But this rule of law has nothing to do with the rule of equitable consideration which recognizes equitable assignments. It has been well said that "the doctrine of equitable liens would never have come into existence if it were true that one who claims such a lien must first show a lien at

law. *Equitable liens became necessary precisely on account of the absence of similar remedies of law."* (Italics ours.) See *Fee-Crayton Hardwood Co. v. Richardson-Warren Co.* (D. C.), 18 F.(2d), 617, 623.

In 5 R. C. L., 498, it is said that "it is the sole function of a check to effect the transfer of money; and, similarly, in 48 C. J., 617, it is said that the issuance of a check for an obligation is "for convenience often treated as the passage of money." From a standpoint of equitable consideration, the moment that the Bamberg bank issued its draft on the Charleston bank, as a substitute for cash, its deposit account was diminished by the amount of the draft. It appeared on the books of the bank, evidencing the understanding of the transaction, that the bank no longer owned that much of its deposit; and it would not have been good faith for the bank to withdraw the funds after giving the draft.

Reference has already been made to the provisions of the 1930 Act, which was designed to provide uniformity of law governing the practice of the banks and the rights of the parties in respect to the collection and payment of checks. It is quite obvious that the uncertainty of rights under the decisions, added to the uncertainties arising because of risks of loss unless payments and remittances be required in cash, have had serious effect, and quite conceivably may result in even more serious and embarrassing consequences. For, as was said in *Witt, Receiver, v. People's State Bank et al., supra,* "it would defeat the banking system to require payment in currency of every item."

Under the banking practice as it stood up to the time that the statutory laws governing check collections and payments was enacted, it was a well-recognized rule that the obligation of the drawee bank was to pay in money and nothing else, irrespective of the mode of presentment of the checks. *Ex Parte Wachovia Bank & Trust Company,* 160 S. C., 104, 158 S. E., 214. *Federal Reserve Bank of Richmond v.*

*Malloy,* 264 U. S., 160, 44 S. Ct., 296, 68 L. Ed., 617, 31 A. L. R., 1261.

The great burden to which the banks may become subject unless some manner of relief is provided is pointed out by Circuit Judge Parker in *Cleve v. Craven Chemical Co.* (C. C. A., 4th Circuit), 18 F.(2d), 711, 713, 52 A. L. R., 980, in his discussion of the North Carolina statute (applicable expressly to checks presented "by or through any Federal Reserve Bank, Post Office, or Express Company, or any respective agents thereof") which—as to such checks— sought to remove (when the drawer acquiesced) the absolute requirement of the common law that a check presented at the bank counter would be paid in cash. In speaking of the effect of presenting the checks over the counter of the bank and demanding payment in cash, one of the embarrassments particularly stressed was the effect to reduce the income-producing assets of the bank *"through the necessity of keeping in their vaults in cash a much larger part of their resources than had theretofore been customary."*

It is easy to imagine even more serious dangers in many communities arising out of the personal presentation of checks over the counter. The payment of large amounts of cash over the counter to owners of items, personally presenting the items and demanding cash, would no doubt be calculated, in many instances, in these times of unsettled banking conditions, to precipitate runs on even solvent banks and bring community disaster as a consequence.

When the statute is considered from the viewpoint of banking needs and convenience, it is manifest that the particular provisions of the Act, as contained in Section 13, were not designed, in their primary purpose, to give preference to one class over another; but the real purpose was to relieve bank conditions, as far as practicable, from one of its most serious present day perils.

It is our opinion that the appellant was entitled to the preference he claimed, and, accordingly, the order appealed from should be reversed.

MR. ACTING ASSOCIATE JUSTICE W. C. COTHRAN (dissenting).

I concur in the proposed result of the opinion of the CHIEF JUSTICE upon the ground that the Act of 1930 is conclusive of this case and is applicable thereto. The draft accepted by Sanders was not an unconditional credit; in fact, this draft was not entered on the books of any bank as a credit.

While believing that Sanders is entitled to a preference, I do not think the cases of *Railway Express Agency v. Bethea,* 165 S. C., 230, 163 S. E., 637, or *Hampton Loan & Exchange Bank v. Lightsey, Receiver,* 155 S. C., 222, 228, 152 S. E., 425, are authority for such belief.

Nor do I subscribe to the doctrine of equitable assignment as set forth in the opinion of the CHIEF JUSTICE, for the reason that such equitable assignments are opposed to the provisions of our Negotiable Instruments Law. Equity supplies a remedy where the law is impotent, but I know of no authority under which equity can be called upon to supply a remedy which is directly forbidden by law.